UNITED STATES, Appellee,

v.

Jonathan HINTON, Private,
U.S. Marine Corps, Appellant.

No. 50713.
NMCM 84–0281.

U.S. Court of Military Appeals.

Feb. 3, 1986.

For Appellant: *Commander David C. Larson*, JAGC, USN (argued).

For Appellee: *Captain Carl H. Horst*, JAGC, USN (argued); *Captain W.J. Hughes*, JAGC, USN and *Captain David B. Stratton*, USMC (on brief).

*Opinion of the Court*

EVERETT, Chief Judge:

A general court-martial with officer members tried appellant on charges that on May 29, 1983, he conspired with Private Michael Blue to rob two other marines; on the same date, he committed the planned robbery; and in June 1983 he possessed and distributed marihuana, in violation of Articles 81, 122, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 922, and 934, respectively. Contrary to his pleas, Hinton was found guilty of these charges and was sentenced to a dishonorable discharge, confinement for 20 years, and total forfeitures. The convening authority approved the findings and sentence; and the Court of Military Review affirmed the findings and the sentence except for confinement in excess of 12 years. Thereafter we granted review of two issues concerned

with the Government's failure to produce an alibi witness requested by the defense.[1]

## I

The court-martial convened initially for a session under Article 39(a), UCMJ, 10 U.S.C. § 839(a), on the afternoon of September 8, 1983—less than an hour after conclusion of the trial of appellant's co-accused, Private Blue. During this session, defense counsel stated that he had submitted a number of witness requests and that he desired a continuance "until a time that all the defense witnesses are brought to the Combat Center for the trial." After some discussion, the military judge scheduled the case for trial on September 22.

On September 21, another Article 39(a) session was held; and the judge considered various motions. At this time, defense counsel unsuccessfully sought a continuance in order to find three defense witnesses who had not yet been located. When court reconvened on the morning of September 22, defense counsel asked for and received a two-hour recess, so that he might discuss some further matters with appellant. After this recess, trial counsel announced that "it has come to the Government's attention that we have not been able to locate one of the witnesses that the defense has requested. His name is Mayo Goldman." The prosecutor had personally served Goldman with a subpoena on September 19 and had tendered him a government check for expenses to travel from his residence in San Bernardino, California, to the place of trial at Twentynine Palms. A copy of the subpoena, for which Goldman had receipted, was marked as an appellate exhibit.

According to trial counsel, "[T]he Government's position is that ... [Goldman] is a civilian witness. We have done everything that we can to get him here. The Government is ready to proceed." Defense counsel responded "that further efforts are possible in order to get Mr. GOLDMAN here. That would be in the form of having an order issued from the nearest Federal Court, or something of that nature, in order to show Mr. GOLDMAN that it is absolutely necessary that he be here as a witness in the trial of Private HINTON."

The judge then observed:

At this point, without anything further, I don't have any reason to entertain a request for a continuance, in regard to a civilian witness, when all efforts have been made to produce the witness. I don't know where Mr. GOLDMAN is or why he is not here, of course. The court does, of course, recognize the authority of the court to order civilian personnel to appear, *or lack of authority*.

In regard to any other points, I cannot—will not grant a continuance to find Mayo GOLDMAN. He was served and was supposed to come, but is not here.

(Emphasis added.)

Thereupon, "as an offer of proof," defense counsel offered the witness request, dated August 31, 1983, which he had made for Goldman's attendance at trial. According to this document, the witness resided "at 215 E. 18th Street, San Bernardino, California"; and his expected testimony was: "On 27 May 1983, he gave Private HINTON a ride to his girlfriend's house in Riverside, they got together again Sunday night (29 May) in San Bernardino and did not return to Twentynine Palms until late Sunday or early Monday." The stated reason necessitating the witness' "personal appearance" was: "Private HINTON allegedly committed a robbery on 29 May. The testimony of Mayo GOLDMAN would show that Private HINTON wasn't even in the area at the time of the alleged robbery."

The judge responded:

The court appreciates the desire of the defense. However, the court has—the

---

1.

I

WHETHER THE MILITARY JUDGE COMMITTED PREJUDICIAL ERROR BY FAILING TO REQUIRE THE GOVERNMENT TO PRODUCE THE DEFENSE WITNESS MAYO GOLDMAN.

II

WHETHER THE MILITARY JUDGE COMMITTED PREJUDICIAL ERROR BY DENYING A REQUEST FOR A CONTINUANCE TO LOCATE A DEFENSE WITNESS WHO HAD BEEN SUBPOENED FOR TRIAL BUT FAILED TO APPEAR.

case has been set for trial. People are here. I don't know how long the trial will run. I do not intend to recess the court in regard to this point, or continue the case at this point. That is, if there is a specific request for a continuance, based on the non-appearance of Mayo GOLDMAN, the request is denied.

When the trial commenced, the two victims testified that at about 6:00 to 6:30 p.m. on May 29, 1983, they had been robbed at the Twentynine Palms Combat Center. Although these witnesses had been unable to identify either Hinton or his co-accused, Blue, as the robbers, the Government attempted to link appellant to the crime by circumstantial evidence and by his own incriminating admissions.[2]

Appellant sought to establish an alibi as his defense. To this end, his girlfriend's mother testified that on Friday, May 27, 1983, Hinton had arrived about 10:00 or 11:00 p.m. at their home in Riverside, California, and had stayed there until about 5:30 or 5:40 p.m. on Sunday, May 29. His girlfriend averred that Hinton had come after she had gone to sleep on May 27 and had stayed there in Riverside until 5:30 p.m. on May 29. According to both women, their home was an hour and a half or an hour and forty-five minutes drive from Twentynine Palms.

Hinton testified that Mayo Goldman had driven him to his girlfriend's house in Riverside, where they arrived between 11:00 and 11:30 p.m. on May 27, and then had picked him up there on Sunday about 5:30 or 6:00 p.m. Thereafter, they visited a disco in nearby San Bernardino, where they remained until 3:00 a.m. Next, they drove to the house of Goldman's girlfriend and stayed there for an hour and a half; and finally they returned to Twentynine Palms between 5:00 and 6:00 a.m. after a drive of an hour and a half or two hours.

## II

### A

The sixth amendment to the United States Constitution grants to an accused in a criminal prosecution the right "to have compulsory process for obtaining witnesses in his favor." This right of an accused to compel the attendance of witnesses in his behalf is well established in military law and has been guarded by this Court. *See, e.g., United States v. Carpenter*, 1 M.J. 384 (C.M.A.1976); *United States v. Iturralde-Aponte*, 1 M.J. 196 (C.M.A.1975).

Consistent with the constitutional mandate, Article 46 of the Uniform Code, 10 U.S.C. § 846, directs that

[t]he trial counsel, the defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe. Process issued in court-martial cases to compel witnesses to appear and testify and to compel the production of other evidence shall be similar to that which courts of the United States having criminal jurisdiction may lawfully issue and shall run to any part of the United States, or the Territories, Commonwealths, and possessions.

Refusal to comply with a subpoena to appear as a witness before a court-martial is itself an offense which may be prosecuted "in a United States district court or in a court of original criminal jurisdiction in any of the Territories, Commonwealths, or possessions of the United States"; and the punishment may include a $500.00 fine, imprisonment for not more than 6 months, or both. *See* Article 47, UCMJ, 10 U.S.C. § 847.

Pursuant to the power conferred by Article 46 of the Code, the President has delineated methods for obtaining the attendance of witnesses, both military and civilian, *see* para. 115, Manual for Courts-Martial, United States, 1969 (Revised edition); para. 115, Manual for Courts-Martial, United States, 1951; *see also* R.C.M. 703(e), Manual for Courts-Martial, United States, 1984. Under the regulations prescribed by the Presi-

---

**2.** The defense vigorously contested the existence of such admissions.

dent, a subpoena may be issued for a civilian witness—just as it was in this case. Moreover, since 1951, the Manual for Courts-Martial has authorized issuance of a warrant of attachment to compel forcibly the attendance of a material witness who has refused or willfully neglected to appear at the time and place specified on his subpoena. *See* para. 115d (2) and (3), 1969 Manual, *supra;* para. 115d (3), 1951 Manual, *supra; see also* R.C.M. 703(e)(2)(G), 1984 Manual, *supra* ; Lederer, *Warrants of Attachment—Forcibly Compelling the Attendance of Witnesses*, 98 Mil.L.Rev. 1 (Fall 1982) [hereafter cited as Lederer].

The 1951 Manual provided that in an appropriate case the trial counsel would issue a warrant of attachment "and deliver or send it for execution to an officer designated for the purpose by the commander of the proper army area, naval district, air command, or other appropriate command." *See* para. 115d (3). Apparently this language contemplated that the execution of the warrant would be by a military officer; and the form for a warrant of attachment contained in the 1951 Manual supports this interpretation. *See* App. 19.

According to the 1969 Manual—which was in effect at the time of Hinton's trial—the trial counsel will prepare the warrant of attachment "and, when practicable, effect execution through a civil officer of the United States. Otherwise, the trial counsel will deliver or send it for execution to an officer designated for the purpose by the commander of the proper army area, naval district, air command, or other appropriate command." Para. 115d (3).

The 1984 Manual directs that "[t]he military judge or, if there is no military judge, the convening authority may, in accordance with this rule, issue a warrant of attachment to compel the attendance of a witness or production of documents." R.C.M.

703(e)(2)(G)(i).[3] The warrant "may be executed by a United States marshal or such other person who is not less than 18 years of age as the authority issuing the warrant may direct." R.C.M. 703(e)(2)(G)(iv).

▮ When Mayo Goldman, the subpoenaed witness, failed to appear on September 22, the military judge apparently felt powerless to compel his attendance. As the Court of Military Review acknowledged, he was in error. Unpublished opinion at 5. In the first place, there was a possibility that, if confronted with the criminal penalties imposable for nonattendance, Goldman would have appeared voluntarily.[1] If, despite threats of prosecution, Goldman still refused to appear, there remained the ultimate weapon—a warrant of attachment.

In oral argument before this Court, government appellate counsel—relying on his own extensive experience—suggested that this purported means for compelling the attendance of an uncooperative civilian witness is illusory. According to him, United States marshals are reluctant to execute a warrant of attachment issued by a court-martial.

While there apparently have been occasions when a federal marshal was unwilling to execute a warrant of attachment, *see* Lederer, *supra* at 43 n. 213, there also have been instances when a Marshal has agreed to execute this writ. *Id*. at 5 n. 13. Even though the use of the warrant of attachment is infrequent, this probably is because civilian witnesses usually can be persuaded to appear before courts-martial. Certainly, we have no doubt as to the legality of writs of attachment, *see, e.g., United States v. Shibley*, 112 F.Supp. 734 (S.D.Cal. 1953); and so we can not understand on what basis United States Marshals could properly decline to execute warrants of at-

---

3. Transfer of this authority to the military judge may have resulted from suggestions made by Major Lederer in his article (n. 5, *infra* ). *See* Drafters' Analysis, Appendix 21, Manual for Courts-Martial, United States, 1984.

4. Of course, it is possible that, instead of refusing to appear, Goldman was sick, had been injured in an accident, or had some other reason for not being present. Because no continuance was allowed to permit further efforts to obtain Goldman's presence, we do not know why he was absent.

tachment. *See* Lederer, *supra* at 43 n. 212. Indeed, the Department of Justice seems to have concurred fully with the view "that marshals are 'authorized, and obliged to serve the process of courts-martial, including warrants of attachment, upon civilians'"; and on March 5, 1981, the Deputy Attorney General "asked that the Marshals Service make 'every effort' to respond to a military request for service" of such warrants. *Id.* at 44 n. 219.[5]

Where civilian witnesses are involved, it is desirable for a warrant of attachment to be served by a Marshal or other civil officer in order to minimize possible friction or misunderstanding. However, if no civil officer is available, there still remains the lawful alternative of service of the warrant by a military officer.[6] Until that alternative has also been exhausted, it cannot be said that the right to compulsory process has been vindicated.

■ Under the provisions of the Navy Judge Advocate General's Manual:[7]

Warrants of attachment shall not be issued without prior approval of the Judge Advocate General, acting for the Secretary of the Navy, in each case.

Certainly the Navy can properly exercise this internal control over the issuance of these warrants because the execution of a warrant of attachment may lead to public relations and other problems. However, a refusal by Naval authorities to allow issuance of a warrant of attachment for a civilian witness must be charged against the Government—not against the accused. Accordingly, if the witness is material, the prosecution will be subject to the penalties that usually accrue when the Government

fails to produce a material witness, *see, e.g., United States v. Carpenter, supra.*

Congress and the President have taken steps to assure that a court-martial—where important issues of life and liberty are decided—will hear the testimony of material witnesses. Consequently, there is no occasion to tolerate refusals to honor the process of a court-martial.[8] If, as contended by appellate government counsel, "bureaucratic" problems are so severe that the presence of uncooperative civilian witnesses cannot be obtained for trials by court-martial, this fact should be made known and brought to public attention. In that event, we have no doubt that Congress and the President will act promptly to correct the situation.

No witness—military or civilian—may be allowed to thumb his nose at the lawful process of a court-martial. In this case, the military judge condoned, rather than corrected, the witness' defiance of lawful authority; and we decline to accept this condonation nonchalantly.

B

■ The Court of Military Review found no abuse of discretion on the part of the military judge because defense counsel had not renewed his request for Goldman's appearance after appellant had testified. The premise for this view was that the synopsis of Goldman's anticipated testimony in the defense's witness request stated that Goldman had taken appellant "to his girlfriend's house in Riverside on May 27" and "they got together again in San Bernardino on Sunday night 29 May." Unpublished opinion at 5. On the other hand, appellant had testified that Goldman had "picked him up"

---

5. However, the Deputy Attorney General "also stated that he was requesting the armed forces to use other means of service where possible." Lederer, *Warrants of Attachment—Forcibly Compelling the Attendance of Witnesses*, 98 Mil.L.Rev. 1 (Fall 1982) [hereafter cited as Lederer].

6. There is precedent for execution of the warrant in this manner. Lederer, *supra* at 5 n. 13. Apparently the warrant of attachment in *United States v. Shibley*, 112 F.Supp. 734 (S.D.Cal.1953), was served by a military officer.

7. JAGMAN 0139.

8. Of course, we are not concerned here with the situation where a witness cannot be located after reasonable search or where a witness cannot be compelled to appear. *E.g., United States v. Bennett*, 12 M.J. 463 (C.M.A.1982). Instead, our focus is on cases where means exist to compel attendance which have not been utilized.

at his girl friend's house in Riverside and then he and Goldman had passed the night at various places in nearby San Bernardino.

No one at trial ever referred to this possible inconsistency; and even to find that it exists requires a highly technical reading of the witness request. Certainly, defense counsel never indicated that he had abandoned his announced intention to call Goldman as a witness; and the military judge in no way intimated that he was relying on any such abandonment. Of course, if the judge had inquired on the record as to whether the defense counsel still wished to have Goldman as a witness in light of a possible discrepancy between his testimony and that of appellant and then had received a negative response, the nonproduction of the witness would have been waived. However, on this record, there was no waiver. Defense counsel, who had already been informed by the military judge that he could do nothing about granting a continuance, was not obligated to renew the request for relief in the absence of circumstances indicating much more clearly than here that the judge might be willing to change his mind.

### C

The Court of Military Review stated that "[w]e are convinced beyond a reasonable doubt that there is no reasonable likelihood that the proffered testimony of Goldman would have affected the outcome of the trial." *Id.* at 6. The Court of Military Review has broad factfinding powers; but those powers do not extend to determining the credibility of an absent alibi witness whose presence should have been compelled by the Government. We are unsure how overwhelming the government evidence must be to justify such a determination—if it could be justified at all; but certainly nothing in this record authorizes the cavalier disregard of the alibi testimony that might have been presented.

### III

The decision of the United States Navy-Marine Corps Court of Military Review is reversed as to Charges I and II and their specifications, and the sentence. The findings of guilty thereon and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Navy for remand to that court which may reassess the sentence based on the remaining findings of guilty or order a rehearing on the affected charges and the sentence.

Judge COX concurs.