**UNITED STATES, Appellee,**

v.

**Jerry BURNS, Specialist Five, U.S. Army, Appellant.**

**No. 50,830.**
**CM 443923.**

U.S. Court of Military Appeals.

Sept. 30, 1988.

For Appellant: *Colonel Brooks B. La-Grua, Lieutenant Colonel Arthur L. Hunt, Major Marion E. Winter, Captain Carolyn F. Washington* (on brief); *Colonel William G. Eckhardt, Lieutenant Colonel Arthur L. Hunt, Captain Thomas J. Feeney.*

For Appellee: *Colonel James Kucera, Lieutenant Colonel Adrian J. Gravelle, Lieutenant Colonel Joseph A. Rehyansky, Captain Stephen B. Pence* (on brief); *Captain Karen A. Charbonneau.*

*Opinion of the Court*

EVERETT, Chief Judge:

On January 13–14 and February 15, 1983, Specialist Five Jerry Burns was tried at Fort Jackson, South Carolina, before a military judge sitting as a general court-martial. Contrary to his pleas, he was found guilty of a number of serious offenses, including an aggravated assault on Joann Williams, in violation of Article 128, Uniform Code of Military Justice, 10 U.S.C. § 928. He was sentenced to a dishonorable discharge, confinement for 26 months, total forfeitures, and reduction to the grade of Private E–1. The convening authority approved the sentence. The Court of Military Review made a minor change in the findings as to one of the specifications and then affirmed the remaining findings and sentence. The court later denied appellant's motion for reconsideration. Thereafter, we granted review to consider the following issue:

> WHETHER APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO CONFRONT ADVERSE WITNESSES BY THE ERRONEOUS ADMISSION OF APPELLATE EXHIBIT V, THE AR-TICLE 32 TESTIMONY OF MS. JOANN WILLIAMS, AS SUBSTANTIVE EVIDENCE OF THE MATTERS ASSERTED THEREIN.

I

At appellant's Article 32, UCMJ, 10 U.S.C § 832, investigation, Joann Williams testified under oath that she had been waiting near Fort Jackson to catch a bus very late on the evening of November 15, 1982. Burns stopped and offered her a ride to downtown Columbia; but once she was in his car, he kidnapped her and drove to Fort Jackson, where he took her to his room, threatened, raped, sodomized, and robbed her. When she tried to escape, he cut her on the neck with a knife and tied her up. She also saw him get some bullets and a gun from behind a ceiling tile in his room. Around 5:45 a.m., Burns said he was taking her back; but she broke away, ran, and reported the incident to a sergeant who was nearby. She showed the room to the sergeant and saw Burns speed away in his car with his lights off. Ms. Williams was taken by the military police to the hospital at Fort Jackson where a nurse treated her cut.

She also testified at the pretrial investigation that she was approximately 21 years old; that her mother's name was "Mattie Williams"; and that her "home" address was 432 Toal Street. Sometimes she stayed at Dreamland Inn where her boyfriend also stayed and where her mother was a maid. Despite some insinuation by defense counsel that the Inn was notorious for prostitution, Ms. Williams repeatedly denied that she was a prostitute, had ever engaged in sex for money, or had danced in nightclubs. Instead, she professed to be a creative dancer—"that's mainly done at schools and auditoriums." She also claimed that "I mainly go to school" at the Logan Night School.

By reason of the events about which Ms. Williams had testified at the Article 32 investigation, numerous charges against Burns—including kidnapping, rape, sodomy, robbery, communicating threats, and

aggravated assault, in violation of Articles 134, 120, 125, 122, and 128, UCMJ, 10 U.S.C §§ 934, 920, 925, 922, and 928, respectively—were referred to a general court-martial for trial.[1] However, subsequently the staff judge advocate informed the convening authority that

[o]n approximately 5 January 1983, it was discovered that the alleged rape victim in the Burns Trial, Miss Joann Williams, lied under oath at the Article 32 Investigation regarding at least three points. Miss Williams indicated at the Article 32 and to the Fort Jackson CID investigators that she was approximately 21 years old. She is 16 years old. Miss Williams testified at the Article 32 that her mother's name was Mattie Williams. Her mother's name is Edith Bradley. Miss Williams was also repeatedly questioned and repeatedly denied being a prostitute or ever being involved in any type of prostitution. Miss Williams has been arrested twice for solicitation to commit prostitution, and has been found guilty by a juvenile court for possession of .3 grams of marijuana and solicitation to commit prostitution. The latter conviction for solicitation was ruled on by the South Carolina Juvenile Court within the past three weeks, and actual sentencing has not yet occurred.

The staff judge advocate acknowledged "that the credibility of Miss Williams will be an issue in the trial," but—"having considered Miss Williams' untruthful testimony rendered under oath at the Article 32 investigation" and having also examined all the evidence about her which had been presented at the Article 32 investigation—he still recommended that the same charges against Burns be referred for trial.[2] The convening authority acceded to this recommendation.[3]

When appellant's court-martial began about a month and a half after his pretrial investigation, Ms. Williams failed to appear

in court. Trial counsel then announced that he would establish her "unavailability" in order to introduce her former testimony in evidence. Thereupon, he called Private Edward A. Elfrink, who testified that he was a legal clerk in the office of the staff judge advocate and that his principal function was to gather witnesses for trials by court-martial. For several weeks he had been calling Ms. Williams, but he had never reached her. Elfrink attempted to reach her at three different places—Dreamland Inn, 104 Howe Street, and Henley Homes.

Twice he had sent a subpoena by certified mail to Ms. Williams at the Henley Homes address; and on one of these occasions he had received back the "returned receipt," which had a signature purporting to be that of Joann Williams. However, Elfrink admitted that he was not familiar with her signature and had not ascertained whether someone else had signed her name on the returned receipt. The receipt—which, after identification by Elfrink, was admitted as a prosecution exhibit—indicates that a letter was sent "restricted delivery" to Joann K. Williams; that it was signed for on February 9, 1983; and that the signature of the recipient purports to be that of the addressee. Moreover, this exhibit reflects that the certified letter had been sent to Ms. Williams at 15–1 Henley Homes, South Bull Street, Columbia, and had been mailed the day before.

Elfrink identified the next prosecution exhibit as a copy of the subpoena which had been enclosed in the delivered certified letter. The subpoena had been signed by trial counsel and required Ms. Williams to appear as a witness at appellant's court-martial at 8:00 a.m. on February 15, 1983.

Finally, Elfrink testified that, in seeking to locate Ms. Williams, he had been in contact with Ms. Lydia Brown, who was her counselor from the Department of Youth Services in Columbia. His last con-

1. A large number of other serious charges unrelated to the ones directly involving Ms. Williams were also referred for trial by general court-martial.

2. See Addendum to the Pretrial Advice of the Staff Judge Advocate.

3. See Advice on Disposition of Court-Martial Charges.

tact with Ms. Brown had occurred some 15 minutes before he took the stand.

Ms. Lydia Brown then testified that she was a Probation Counselor for the South Carolina Department of Youth Services; that she knew Joann Williams; and that she had made efforts to have her appear at appellant's court-martial. On February 4, 1983, Ms. Williams' mother—whom this witness referred to as "Mrs. Bradley"—notified her that Joann had left home around the first of February. According to Ms. Brown, "It is not uncommon for Joann to leave home for two or three days, being gone and return home." However, on February 10, Ms. Brown concluded that it was necessary to notify the police of Ms. Williams' absence; and as of February 15 —the date of trial—neither the continuing efforts of Ms. Brown nor those of the police had been successful in locating the missing witness.

Ms. Brown also testified that she had talked to Mrs. Bradley about the signature on the returned receipt. Mrs. Bradley had denied receiving any mail about her daughter's appearance in court or signing Joann's name on the receipt. Mrs. Bradley had stated that no one else except Ms. Williams had access to her home and that only she, herself, had a mailbox key. Mrs. Bradley also had told Ms. Brown "that Joann comes back in the home while she's not at home and leaves before she gets home from work."

On cross-examination, Ms. Brown testified that Ms. Williams had not "left home under any unusual circumstances or anything"; and that she had not looked actively for her until several days after February 4—the date when Mrs. Bradley first notified her that Ms. Williams had left home. Ms. Brown had been advised of several places that Ms. Williams frequented. According to Ms. Brown, she was trying to locate Ms. Williams for the Department of Youth Services and to assure that the witness appeared at the court-martial. Ms. Brown testified that, if a juvenile was absent without permission from the Department, "then we do take further action

against the juvenile." According to Ms. Brown, she was Ms. Williams' probation officer and had been involved with her since September 1982, when Ms. Williams came under the jurisdiction of the Family Court of Richland County.

During final argument on his request to have Joann Williams declared "unavailable," trial counsel contended that both the civilian and military authorities had done everything they could to produce her in court. Defense counsel, on the other hand, argued that proof was lacking that Ms. Williams had even received the subpoena. In this connection, he pointed out that the subpoena supposedly had been signed by Ms. Williams on February 9; but, according to Ms. Brown, she already had left home around February 1. He also emphasized that the subpoena contained a place for acceptance of service, but Ms. Williams had never signed there. Finally, defense counsel insisted that, in view of Ms. Williams' own conduct, the Government was on notice that it would be difficult to get her into the courtroom.

The military judge found Ms. Williams to be "unavailable" and observed:

> [T]here's been more than reasonable activity on the part of the Army through the legal clerk and through the juvenile authorities, through the police and other official agencies to try to contact the individual, and because of this, she apparently has voluntarily decided not to appear and regardless of what we did today, I doubt if we'd be able to locate her.

The judge also based his ruling on the presumption of regularity in the United States mail; on judicial notice that he had taken earlier about the method of delivering certified mail; and on Ms. Brown's testimony that Mrs. Bradley had told her that only she and her daughter would have had access to the certified letter or could have signed the receipt.

In light of the judge's ruling on unavailability, trial counsel offered in evidence a transcript of Ms. Williams' prior testimony. Thereupon, defense counsel objected that

appellant's Sixth-Amendment right of confrontation was being denied; that the Government was attempting to use testimony which it had already conceded was perjured; that the transcript of the pretrial investigation was not "verbatim" but instead was replete with "inaudibles" and gaps; and that the transcript was prepared from a tape made by an unsworn reporter. The defense also contended vigorously that, since Ms. Williams' criminal background and perjury had not been discovered until after the Article 32 investigation, the opportunity and motive in cross-examining her at trial, if she were present, would be quite different from what they had been at the pretrial investigation. Furthermore, the transcript had not been properly authenticated, because authentication was by the custodian of the tapes, rather than by the person who recorded the testimony.

Trial counsel countered that the transcript was an official government record certified by its custodian; that the "inaudibles" were minor; and that the Article 32 investigating officer had testified that the transcript was "fairly complete." The prosecutor also asserted that the defense had been given an opportunity to cross-examine Ms. Williams at the pretrial investigation and that her perjury related only to the weight, rather than admissibility, of her pretrial testimony.

The military judge decided that the defense motive in examining Ms. Williams before trial had been the same as it would be at trial; ruled that the transcript was "sufficiently verbatim" to qualify for admission in evidence under Mil.R.Evid. 804(b)(1), Manual for Courts-Martial, United States, 1969 (Revised edition); and rejected all the other defense contentions.

Thereafter, the parties stipulated—pursuant to the earlier determination by the staff judge advocate—that at the pretrial investigation Ms. Williams had lied about her age, her mother's name, and her criminal background. However, the parties added to their stipulation that, before this investigation, Ms. Williams had not been con-

victed of solicitation; that this conviction came after the Article 32 hearing; and that she had lied about her age when she was treated at Fort Jackson for her cut.

Of the charges involving Ms. Williams as a victim, the military judge found Burns guilty only of aggravated assault and acquitted him of the threats, rape, kidnapping, sodomy, robbery, and other offenses of which Ms. Williams had accused him.

## II

Mil.R.Evid. 804(b)(1) permits the former testimony of an absent witness to be received into evidence as an exception to the hearsay prohibition. However, the declarant must be "unavailable." Mil.R.Evid. 804(b). Likewise, if former testimony is introduced against an accused, the confrontation clause of the Sixth Amendment requires the Government to demonstrate that the declarant is "unavailable." *See United States v. Inadi*, 475 U.S. 387, 393, 106 S.Ct. 1121, 1125, 89 L.Ed.2d 390 (1986); *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *United States v. Cokeley*, 22 M.J. 225, 228 (C.M.A.1986); *United States v. Crockett*, 21 M.J. 423 (C.M.A.), *cert. denied*, 479 U.S. 835, 107 S.Ct. 130, 93 L.Ed.2d 74 (1986). Indeed, the Sixth-Amendment requirement for establishing "unavailability" may be even more stringent than that imposed by Mil.R. Evid. 804. *See United States v. Cordero*, 22 M.J. 216, 220 (C.M.A.1986).

The Supreme Court has made clear that "a witness is not 'unavailable' for purposes of the foregoing exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Barber v. Page*, 390 U.S. 719, 724–25, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968). Moreover, as explained in *Ohio v. Roberts, supra* 448 U.S. at 74, 100 S.Ct. at 2543:

*[I]f there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation.* "The lengths to which the prosecution must go to produce a witness ... is a question of reasonableness." *Califor-*

*nia v. Green,* 399 U.S. [149,] at 189, n. 22, 90 S.Ct., [1930,] at 1951, 26 L.Ed.2d 489 (concurring opinion, citing *Barber v. Page, supra* ). The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness.

(Emphasis added.)

In interpreting *Roberts,* this Court has emphasized that a witness is not "unavailable" unless the Government has exhausted every reasonable means to secure his live testimony. *See, e.g., United States v. Barror,* 23 M.J. 370, 373 (C.M.A.1987); *United States v. Hines,* 23 M.J. 125 (C.M.A.1986); *United States v. Cokeley, supra; cf. United States v. Hinton,* 21 M.J. 267 (C.M.A.1986). Military orders provide a ready means for assuring the presence of service personnel to testify at a trial or investigation. *Cf. United States Navy-Marine Corps Court of Military Review v. Carlucci,* 26 M.J. 328 (C.M.A.1988). However, courts-martial also are empowered to obtain the presence of civilian witnesses. *United States v. Hinton, supra.*

Article 46 of the Uniform Code, 10 U.S.C. § 846, makes available in court-martial cases a process "to compel witnesses to appear and testify and to compel the production of other evidence." This process "shall be similar to that which courts of the United States having criminal jurisdiction may lawfully issue and shall run to any part of the United States, or the Territories, Commonwealths, and possessions." Article 47, UCMJ, 10 U.S.C. § 847, provides that a civilian witness who has been "subpoenaed" and "has been duly paid or tendered the fees and mileage of a witness at the rates allowed to witnesses attending the courts of the United States" is guilty of an offense against the United States if he "willfully neglects or refuses to appear, or refuses to qualify as a witness or to testify or to produce any evidence which that person may have been legally subpoenaed to produce." The punishment for this offense may extend to imprisonment for not more than 6 months and a fine of not more that $500.

Not only is criminal prosecution available for a civilian witness who fails to appear at the time and place specified in his subpoena, but also he may be compelled to attend by means of a warrant of attachment. *See United States v. Hinton, supra.* This warrant may be served by the United States Marshal or other civil officer; and, if no civil officer is available, it may be served by a military officer.

 Obviously, the key to obtaining the presence of a civilian witness at a court-martial is service of a subpoena and tender of a witness fee and mileage. According to R.C.M. 703(e)(2)(D), Manual for Courts-Martial, United States, 1984, "[a] subpoena may be served by the" trial counsel of a special or general court-martial, "a United States marshal, or any other person who is not less than 18 years of age. Service shall be made by delivering a copy of the subpoena to the person named and by tendering to the person named travel orders and fees as may be prescribed by the Secretary concerned." This provision sets out explicitly what paragraph 115*d* (1)— fifth subparagraph, 1969 Manual, *supra,* in effect at the time of trial—set out implicitly. Under the 1969 provision, the mailing of a subpoena does not constitute its service;[4] personal service on the witness is expressly required. The 1984 provision suggests personal service if voluntary attendance is unlikely. *See* Discussion, R.C.M. 703(e)(2)(D), 1984 Manual, *supra.*

 In this case, there is no showing that anyone attempted to deliver personally to Ms. Williams a subpoena requiring her attendance at appellant's court-martial, along with "the fees and mileage" required by Article 46. Thus, the Government never fully invoked the assistance of judicial process to assure her presence, so she could not have been prosecuted under Article 47 for failing to appear. Having failed to use

4. By voluntary acceptance of service indicated on the subpoena itself, a civilian witness may waive his right to formal service.

properly the means at its disposal to compel Ms. Williams' appearance, the Government was not free to claim at trial that she was "unavailable."

The situation here contrasts with that in Ohio v. Roberts, supra, where five subpoenas for four different trial dates had been issued to the witness at her parents' residence and where the efforts to obtain her presence had proceeded over a much longer time than here. Indeed, although Private Elfrink referred to three places at which he had tried to reach Ms. Williams, his search was rather limited, for he did not check some of the locations where she might have been found. Although, at the Article 32 investigation, Ms. Williams had referred to 432 Toal Street as her "home" and had stated that she "mainly" attended school at the Logan Night School, he had not checked either of those places. Moreover, Ms. Williams had testified about the name and address of her boyfriend, who she said was the father of her baby; but Elfrink did not mention any effort on his part to contact this man, who might well have known her whereabouts.

In *United States v. Crockett, supra*, we indicated that the indicia of reliability as to the former testimony of an absent witness might be taken into account in determining how far a prosecutor must go in his "good faith" efforts to locate the witness. On this premise, it would seem especially important for the Government to have made every effort to obtain the presence of Ms. Williams at the trial, since her testimony at the pretrial investigation had included some falsehoods and there were numerous "inaudibles" in the transcript. This effort simply was not made.

▮▮▮ Under the circumstances here, the military judge could properly have granted a continuance in order to allow the Government further opportunity to locate Ms. Williams.[5] We realize, of course, that other charges not involving her were to be tried and that, from the Government's standpoint, it might have been especially

desirable to proceed immediately with trial of those charges. If the Government had so moved, the military judge could properly have severed the charges involving Ms. Williams and allowed trial to continue as to the remaining charges.

Unfortunately, the course which the Government and the military judge chose to pursue—proceeding with trial on all charges and using the former testimony of the absent witness—was not a permissible alternative. Therefore, the findings of guilty of aggravated assault, which depended on the inadmissible former testimony, must be set aside.

### III

The decision of the United States Army Court of Military Review is reversed as to Additional Charge VII and the sentence. The findings of guilty of Additional Charge VII and specification 2 thereunder are set aside. The record of trial is returned to the Judge Advocate General of the Army for submission to that court. It may dismiss the assault offense and reassess the sentence based on the remaining findings of guilty, or it may order a rehearing on the assault offense and the sentence.

Judge SULLIVAN concurs.

COX, Judge (concurring in the result):

Because of my considerable experience presiding as a trial judge in Richland County, Columbia, South Carolina, I have personal knowledge of how difficult it is to locate witnesses—and even defendants—who are wanted for a particular trial. Accordingly, I cannot, in good conscience, participate in the majority opinion as it relates to "unavailability."

Nevertheless, in spite of the superb job done here by the military judge in disregarding most of the victim's statement, this is one of those cases where it seems to me that confrontation is essential. Indeed, the Government stipulated that the victim was untruthful. I believe the statement is unreliable as a matter of law.

---

5. The government effort to obtain her presence was sufficient to entitle it to a continuance when she failed to appear.