## UNITED STATES

v.

## Senior Master Sergeant Charles W. HAMILTON, FR257–82–5541 United States Air Force.

### Misc. Dkt. No. 92–17.

U.S. Air Force Court of Military Review.

22 Feb. 1993.

Appellate Counsel for the Appellant: Lieutenant Colonel Terry J. Woodhouse, Major Mary C. Yastishock, and Mr. Joe Episcopo, Esquire.

Appellate Counsel for the United States: Colonel Richard L. Purdon, Lieutenant Colonel Jeffery T. Infelise, Captain David C. Wesley, and Captain William B. Boyce.

Before LEONARD, JAMES, and JOHNSON, Appellate Military Judges.

## OPINION OF THE COURT

JOHNSON, Judge:

This is an appeal by the government under Article 62, UCMJ, 10 U.S.C. § 862, of a ruling by the military judge which excludes evidence that is substantial proof of a fact material in the proceeding. On 10 November 1992 Sergeant Hamilton was arraigned before a general court-martial at MacDill Air Force Base, Florida. The charges allege that while he was deployed to Dhahran, Saudi Arabia, in late 1991 he arranged for persons in the United States to mail him alcoholic beverages, some of which he drank and some of which he transferred or sold to others. He is also charged with wrongfully mailing large amounts of currency to his wife in the United States.[1]

The subject of this appeal is a ruling by the military judge granting a defense motion *in limine* [2] to exclude from evidence the deposition of a government witness, Mr. Echalas. This witness' testimony is key to the prosecution's case as to two of the six specifications and tends to corroborate other evidence on the remaining specifications. Mr. Echalas testified in a deposition taken in Manila, Republic of the Philippines, on 4 November 1992, that he received, from Sergeant Hamilton, 36 bottles of gin and vodka contained in boxes with United States mail markings on them. Mr. Echalas sold them and shared the proceeds with Sergeant Hamilton. This evidence excluded by the military judge clearly meets the standard of substantial proof of a material fact authorizing a government appeal under Article 62, UCMJ and R.C.M. 908.

---

1. Respondent is charged with knowingly causing prohibited items to be delivered through the United States mail in violation of 18 U.S.C. § 1716(f) (1988), and of wrongful transportation of more than $10,000 in cash into the United States and wrongfully failing to report that he had done so, in violation of 31 U.S.C. § 5316 (1988), all charged as violations of Article 134, UCMJ, 10 U.S.C. § 934, federal "crimes and offenses not capital." He is also charged under Article 92, UCMJ, 10 U.S.C. § 892, with wrongfully consuming, transferring, and selling alcoholic beverages in the United States Central Command area of responsibility in violation of a lawful general regulation, and under Article 81, UCMJ, 10 U.S.C. § 881, with conspiracy to wrongfully sell alcoholic beverages in violation of the same regulation.

2. R.C.M. 905.

■ In deciding a government appeal under Article 62, UCMJ and R.C.M. 908 a court of military review may act only with respect to matters of law. We are bound by the military judge's findings of fact unless they are not fairly supported by the record or are clearly erroneous. Article 62(b), UCMJ; *United States v. Burris,* 21 M.J. 140 (C.M.A.1985); *United States v. Fowler,* 24 M.J. 530 (A.F.C.M.R.1987).

For 7 years before the alleged offenses, Mr. Echalas was a contractor employee in Saudi Arabia where his duties included handling mail. He knew Sergeant Hamilton from Sergeant Hamilton's prior assignment in Saudi Arabia as director of operations for the Air Force postal detachment at Dhahran. The two men renewed their acquaintance when Sergeant Hamilton was assigned to the postal detachment at Dhahran in a temporary duty status in 1991. On 24 December 1991, Mr. Echalas gave a statement concerning the charges against Sergeant Hamilton to agents of the Air Force Office of Special Investigations (OSI). On 10 January 1992 Mr. Echalas left Saudi Arabia and returned to his home in the Philippines, where he remains.

Mr. Echalas did not testify at the Article 32 investigation held at MacDill concerning the charges against Sergeant Hamilton. The investigating officer found Mr. Echalas was not reasonably available,[3] and for purposes of the Article 32 investigation he considered Mr. Echalas's sworn statement given in Dhahran to OSI investigators. When Mr. Echalas was contacted at his home in the Philippines by agents of the United States Naval Investigative Service (NIS) on 30 April 1992, he indicated he was willing to travel to the United States to testify at Sergeant Hamilton's trial. When NIS agents returned to talk to him again on 2 September 1992, however, he had changed his mind and would not travel to the United States to testify. His stated reasons were that he needed to be at home to tend his farm, and his family did not want him to go.

The charges against Sergeant Hamilton were referred to trial on 15 October 1992. The government requested the convening authority to appoint a deposition officer to depose Mr. Echalas in the Philippines, and on 29 October 1992 the convening authority appointed as deposition officer an Air Force judge advocate assigned to the United States embassy in Manila. The deposition was scheduled for 4 November 1992. On 29 October 1992 Sergeant Hamilton's civilian defense counsel contacted the military judge and objected to conducting the deposition before 11 November 1992 because he would be unavailable until that date. The military judge conducted a telephonic conference with the parties[4] but deferred any ruling on the defense objection until the first trial session, which he set for 10 November 1992.

Meanwhile, the assistant trial counsel, the detailed military defense counsel, Sergeant Hamilton, and the court reporter traveled to Manila, where the deposition was conducted on 4 November 1992. Mr. Echalas also traveled to Manila, which is a 12-hour bus ride from his home in a remote area of the Philippines largely under the control of communist insurgents.

At an Article 39(a) session on 10 November 1992, Sergeant Hamilton was arraigned and the defense made its motion *in limine* to exclude the deposition. The military judge received evidence, heard argument, and took the motion under advisement. At another Article 39(a) session on 12 November 1992 he announced his findings and granted the defense motion. On 16 November 1992 the military judge denied a government motion for reconsideration. He also denied a government motion to order that a new deposition be conducted in Manila before 24 November 1992, on the basis that the civilian defense counsel was unavailable. This government appeal ensued.

■ We note at the outset that the military judge refused to consider certain evidence offered by the prosecution concerning the defense motion *in limine,* most

3. R.C.M. 405(g)(4)(B).

4. R.C.M. 802.

notably the transcript of the deposition of Mr. Echalas.[5] The military judge's position was apparently based on a desire to keep himself free from exposure to evidence ultimately ruled to be inadmissible on the merits, in case the accused elected to be tried by military judge alone.[6] This is not proper procedure. The military judge must consider competent evidence offered by either party relating to motions and other issues or he or she will not be able to rule upon them properly, and certainly will be unable to enter "essential findings." R.C.M. 905(d). It is true that exposure to evidence that is ultimately excluded from evidence may, in exceptional circumstances, raise an issue of disqualification of the military judge. Such a result is rare. Military judges are presumed to have a "trained and disciplined judicial intellect" which can disregard inadmissible evidence. *United States v. Winter*, 35 M.J. 93, 95 (C.M.A.1992). In any event, recusal of a military judge would always be preferable to having a military judge make rulings without considering the relevant evidence.

## I. AVAILABILITY OF THE WITNESS

The military judge stated he granted the defense motion to exclude the deposition of Mr. Echalas for three reasons, one of which was the government had not clearly established the witness was unavailable, which is a predicate to admission of the deposition of a government witness under R.C.M. 702, R.C.M. 703, Mil.R.Evid. 804, and the Sixth Amendment to the Constitution of the United States. The primary basis for this ruling was the government of the United States had not requested the assistance of the government of the Philippines in arranging for Mr. Echalas' presence at Sergeant Hamilton's trial in the United States. The military judge concluded this effort was mandatory, based on a portion of the discussion accompanying R.C.M. 703(e)(2)(A), which states, "A witness must be subject to United States jurisdiction to be subject to a subpoena. Foreign nationals in a foreign country are not subject to subpoena. Their presence may be obtained through cooperation of the host nation." We conclude, as a matter of law, that the military judge erred in applying this principle.[7]

■ "Host nation" is a term of art in military law. Since World War II members of the armed forces of the United States have been stationed on a regular basis in the territory of allied nations around the world. The legal status of these forces is established in status of forces agreements that provide for such matters as immunity of the visiting forces from host nation taxation and customs, waiver of normal immigration requirements, claims arrangements, contracting procedures, and the allocation of jurisdiction for prosecution of criminal offenses. The best known of these agreements is the NATO Status of Forces Agreement (NATO SOFA),[8] which has served as a general model for similar agreements with other nations where U.S. forces are stationed. The nation in whose territory the armed forces of another nation are stationed is referred to in most of these agreements as the "receiving state," but in common parlance it is called the "host nation."

Typically, these agreements recognize the authority of the visiting force to prosecute some or all crimes committed by its

---

5. All the items of evidence in the record before us were accepted as appellate exhibits and appended to the record, but the military judge announced that he had not considered some of them.

6. The military judge granted the accused's request to defer his election to be tried by a court composed of members or by the military judge alone. At the time the trial was suspended for this government appeal, the accused had not yet made his election on this matter.

7. We also note the matters contained in the discussion and analysis accompanying the Manual for Courts–Martial (1984) are not directive, nor do they state official policy. MCM, Part I, paragraph 4; Appendix 21 at A21–3 (1984).

8. Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Forces, 19 June 1951, 4 U.S.T. 1792, T.I.A.S. No. 2846, 199 U.N.T.S. 67. The major status of forces agreements to which the United States is a party are reprinted in AFP 110–20, *Selected International Agreements*, Chapter 2, 27 July 1981.

members. Most of them also contain a provision similar to Article VII, paragraph 6 of the NATO SOFA which provides, "The authorities of the receiving and sending States shall assist each other in the carrying out of all necessary investigations into offenses, and in the collection and production of evidence, including the seizure and, in proper cases, the handing over of objects connected with an offense." Such provisions may be further implemented in separate agreements with individual host nations. For example, the supplementary agreement with the Federal Republic of Germany [9] establishes liaison authorities on both sides for the handling of criminal investigations and prosecutions. It provides in Article 37, paragraph 2, "Where persons whose attendance cannot be secured by the military authorities are required as witnesses or experts by a court or a military authority of a sending State, the German courts and authorities shall, in accordance with German law, secure the attendance of such persons before the court or military authority of that State."

Such agreements serve several purposes when the visiting forces request host nation assistance in arranging for the presence of a witness. For the visiting force, the agreement establishes the right to host nation assistance. For the host nation, the agreement may provide the domestic legal underpinning for the issuance of compulsory process.[10] It is important to note, however, that these arrangements apply only when the visiting force is conducting a trial or other proceeding *in the territory of the host nation.* None of these agreements establishes any duty or authority for a host nation to compel one of its own citizens to travel outside its territory to testify as a witness.

The United States is also a party to various "mutual legal assistance" agreements. However, the product of the process established by such agreements (which proceeds through diplomatic channels) is a deposition, not the live testimony of a witness in the territory of the requesting state. In any event, no such agreement exists between the United States and the Philippines.

Many subjects normally addressed by status of forces agreements were included in the Bases Agreement signed in 1947 by the United States and the then newly independent Republic of the Philippines.[11] This agreement was amended formally in 1965 [12] and by a series of exchanges of notes and joint declarations of the parties.[13] Nothing in these agreements provided for the government of the Philippines to compel its citizens to travel outside the territory of the Philippines to testify at a United States court-martial. In any event, the record of trial in this case contains information from the United States embassy in Manila establishing that all these agreements were formally terminated as of 31 December 1992, and that the government of the Philippines regarded them as terminated as of 24 November 1992, when Subic Bay Naval Base, the last U.S. military installation operated under these agreements, was returned to Philippine control.

■ The conclusion to be drawn from this excursion into international law is that in this case the government of the Philippines has no responsibility under any agreement with the United States to com-

9. Supplementary Agreement to the NATO Status of Forces Agreement with Respect to Forces Stationed in the Federal Republic of Germany, 3 August 1959, 1 U.S.T. 532, T.I.A.S. No. 5351, 481 U.N.T.S. 262.

10. *See e.g.,* 22 U.S.C. § 703 (1988) (Compulsory process available in U.S. district courts to compel attendance of witnesses before service courts of friendly foreign forces holding proceedings within the U.S. court's jurisdiction, enforceable by contempt power; similar compulsory process available for depositions; false testimony punishable as contempt.)

11. Agreement Between the United States of America and the Republic of the Philippines Concerning Military Bases, 14 March 1947, 61 Stat. 4019, T.I.A.S. No. 1775, 43 U.N.T.S. 271.

12. Military Bases in the Philippines: Criminal Jurisdiction Arrangements (Agreement Amending the Agreement of 14 March 1947, as Amended), 10 August 1965, 16 U.S.T. 1090, T.I.A.S. No. 5851, 564 U.N.T.S. 208.

13. *See* AFP 110–20, *Selected International Agreements,* 27 July 1981, pp. 2–112–27.

pel one of its citizens to testify before a court-martial convened by the United States forces. Furthermore, there is information in the record from the United States embassy in Manila that there is no domestic legal authority in the Philippines that grants any power to the government to take such action even if it wished do so. We conclude there is no compulsory process available in this case to force Mr. Echalas to testify in person at Sergeant Hamilton's court-martial.

The Supreme Court has ruled that an accused's Sixth Amendment right of confrontation is not offended by prosecution use of prior testimony when two conditions exist: (1) the witness is unavailable, despite good faith efforts by the prosecution, reasonable in the circumstances, to procure the testimony of the witness at trial; and (2) there are sufficient indicia of reliability with regard to the evidence offered as a substitute for such testimony. *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *Mancusi v. Stubbs*, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); *Barber v.Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968). The Court of Military Appeals has made it clear that courts-martial must comply both with these constitutional principles and with the provisions of Mil.R.Evid. 804. *United States v. Ortiz*, 35 M.J. 391 (C.M.A.1992); *United States v. Burns*, 27 M.J. 92 (C.M.A. 1988).

"The law does not require the doing of a futile act." *Ohio v. Roberts*, 448 U.S. at 74, 100 S.Ct. at 2543. On virtually identical facts in *Mancusi v. Stubbs, supra,* the Supreme Court found a witness in a state criminal trial in Tennessee who had moved to Sweden was unavailable to testify where the state was "powerless to compel his attendance at the second trial, whether through its own process or through established procedures depending on the voluntary assistance of another government." 408 U.S. at 212, 92 S.Ct. at 2313. Similarly, the Court of Military Appeals found in *United States v. Cordero*, 22 M.J. 216 (C.M.A.1986), that a witness was unavailable who was issued a subpoena in the United States for a court-martial to be conducted in the United States, but who went home to Germany before trial. The same result was reached in *United States v. Hampton*, 33 M.J. 21 (C.M.A.1991), where a witness was found to be unavailable when she, a German residing in the United States, refused to return to Germany to testify before a United States court-martial. In *United States v. Crockett*, 21 M.J. 423 (C.M.A.1986), *cert. denied*, 479 U.S. 835, 107 S.Ct. 130, 93 L.Ed.2d 74 (1986), a witness was found to be unavailable who resided in Florida and refused invitational travel orders to fly to Germany to testify.

We conclude the military judge erred when he ruled Mr. Echalas was not shown to be unavailable on the basis that the United States government had not asked the Philippine government to arrange for Mr. Echalas's presence at Sergeant Hamilton's court-martial in Florida. There is no international agreement or other established procedure which could be energized by such a request. The government of the Philippines has no domestic authority to compel Mr. Echalas to comply. The United States embassy twice sent Mr. Echalas telegrams inviting him to travel to Florida to testify. NIS agents twice traveled to Mr. Echalas's home. He was asked again during his deposition. He refused. In these circumstances, the government acted reasonably and in good faith to obtain his presence at trial. He was unavailable. The findings of the military judge to the contrary were clearly erroneous.

## II. DEPOSITION

Mil.R.Evid. 804(b) governs the admissibility of certain prior statements of unavailable witnesses. It provides for the use of "a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." As noted above, the relevant decisions of the Supreme Court and the Court of Military Appeals have stressed there are constitutional dimensions to the issue whether there are sufficient indicia of relia-

bility for prosecution evidence offered as a substitute for live testimony. With regard to depositions and former testimony, the primary consideration is whether there was an opportunity for confrontation and adequate cross-examination. *Ohio v. Roberts,* 448 U.S. at 70, 100 S.Ct. at 2541; *United States v. Connor,* 27 M.J. 378 (C.M.A. 1989). The military judge ruled the deposition of Mr. Echalas taken in Manila on 4 November 1992 was inadmissible because the defense was given inadequate notice of the taking of the deposition, and because Sergeant Hamilton was denied the assistance of his civilian defense counsel.

Sergeant Hamilton retained a civilian defense counsel in August 1992. It is unclear when the civilian defense counsel learned the convening authority had appointed a deposition officer, but the record indicates he made a reservation on 27 October 1992 to fly to Manila on 11 November 1992. When he learned the deposition was scheduled for 4 November 1992, he contacted the military judge by telephone. A telephone conference of all the parties was held, at which the civilian defense counsel moved for a delay of at least a week in conducting the deposition, on the basis that he was unavailable before then due to other professional commitments. The military judge deferred ruling on the motion. The deposition was conducted in Manila on 4 November 1992, with the detailed military defense counsel representing Sergeant Hamilton. The civilian defense counsel never contacted the deposition officer, although the deposition officer was available on a 24–hour a day basis by telephone and the civilian defense counsel had been informed in writing how to contact him. The detailed military defense counsel told the deposition officer at the beginning of the deposition that he objected to proceeding in the absence of the civilian defense counsel, but he

was unable to say when, if ever, the civilian defense counsel would appear.

■ There were clearly exigent circumstances that made prompt completion of the deposition important. The final withdrawal of United States forces from the Philippines was scheduled for 24 November 1992. The United States embassy in Manila advised that it expected the government of the Philippines to take the position that the provisions of the Bases Agreement authorizing United States military members to be present in the Philippines would be of no effect after that date. There were growing dangers to United States personnel because of internal turmoil in the Philippines, as a result of which embassy personnel were being transported to and from work in an armored van. Based on these considerations, the embassy stated it would not support conducting a deposition of Mr. Echalas in the Philippines after 24 November 1992. These circumstances have to be considered along with other relevant factors in weighing the reasonableness of decisions made concerning the taking of Mr. Echalas's deposition.

### A. NOTICE

■ The military judge found the government had not provided the defense adequate notice of the deposition as required by R.C.M. 702(e). The reasonableness of notice of a deposition is judged by the length of time required in the circumstances for adequate preparation.[14] The defense was notified orally on 27 October and in writing on 29 October of a deposition to be conducted on 4 November. The witness was one whose statement to the OSI was considered in the Article 32 investigation, in which both the civilian defense counsel and the detailed military defense counsel participated. The military defense counsel interviewed the deponent at length

---

14. *See United States v. Donati,* 14 U.S.C.M.A. 235, 34 C.M.R. 15 (1963) (75 minutes notice insufficient, for previously unknown deponent); *United States v. Marsh,* 35 M.J. 505 (A.F.C.M.R. 1992) (oral notice 1 day before deposition was technically insufficient because not in writing, but was harmless error where there was no prejudice); *United States v. Stewart,* 3 C.M.R.

690 (A.F.B.R.1952) (one hour notice was reasonable where defense counsel was fully prepared); *United States v. Giles,* 42 C.M.R. 880 (A.C.M.R. 1970) (telephone notice approximately 1½ hours before deposition was insufficient, where accused was intoxicated and unable to effectively participate).

the day before the deposition was taken. During the deposition, after a direct examination that covers 12 pages of the transcript, the military defense counsel conducted a searching cross examination that covers 42 pages of the transcript. During this cross examination, the military defense counsel made reference to the deponent's work schedule in Saudi Arabia, which the defense had apparently obtained from some source other than Mr. Echalas. The military defense counsel also displayed familiarity with nuances of Tagalog (which is Mr. Echalas' primary language), and with relevant aspects of Philippine culture, which he learned in a previous assignment in the Philippines. The defense has not asserted that there was any additional matter it would have covered in its cross examination, or that it would have conducted any part of it in any different manner, if it had more time to prepare. The military judge failed to consider the relevant facts contained in the transcript of the deposition, since (as discussed earlier) he refused to read it. The record indicates the defense had ample time to prepare, notice of the deposition was reasonable in the circumstances, and in any event no prejudice to Sergeant Hamilton resulted. The military judge's findings on this subject are clearly erroneous, and they are not based on the evidence of record.

## B. COUNSEL

The final issue in this appeal is whether the military judge erred as a matter of law when he ruled the deposition of Mr. Echalas inadmissible because the deposition was taken, over objection, in the absence of Sergeant Hamilton's civilian defense counsel. We find no error in the military judge's ruling that Sergeant Hamilton was denied his right to counsel, but we find the military judge erred when he refused to consider evidence offered by the prosecution as to whether Sergeant Hamilton was thereby prejudiced.

R.C.M. 702(g)(1)(A)(ii) provides that an accused has the right to be represented at an oral deposition by counsel "as provided in R.C.M. 506." R.C.M. 506 states an accused has the right to be represented by civilian counsel at no expense to the government, and by detailed military counsel or military counsel of his own selection. The right to civilian counsel is grounded in Article 38(b), UCMJ, 10 U.S.C. § 838(b), and the right to be effectively represented by counsel is of course guaranteed by the Sixth Amendment to the U.S. Constitution.

 It is clear, however, that the right to counsel of one's choice is not absolute. The right to the assistance of counsel of choice must be balanced against society's interest in the efficient and expeditious administration of justice. *Morris v. Slappy*, 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983); *United States v. Thomas*, 22 M.J. 57 (C.M.A.1986); *United States v. Marsh*, 35 M.J. 505 (A.F.C.M.R.1992); *United States v. Stevens*, 27 M.J. 626 (A.F.C.M.R. 1988), *affirmed*, 28 M.J. 159 (C.M.A.1989), *cert. denied*, 490 U.S. 1091, 109 S.Ct. 2433, 104 L.Ed.2d 989 (1989); *United States v. Gipson*, 25 M.J. 781 (A.C.M.R.1988), *pet. denied*, 27 M.J. 22 (C.M.A.1988); *United States v. Freedman*, 23 M.J. 820 (N.M.C.M.R.1987), *pet. denied*, 25 M.J. 219 (C.M.A.1987), *cert. denied*, 484 U.S. 1045, 108 S.Ct. 780, 98 L.Ed.2d 866 (1988). In this case, as discussed above, there were exigent reasons for completing the deposition of Mr. Echalas before 24 November 1992. The civilian defense counsel sought a delay of the deposition only until 11 November 1992, however, and there is no persuasive reason apparent from the record why the deposition could not have been delayed until that date. It appeared that the detailed military defense counsel would not be available then, but the reasons for his unavailability were not explored, and in any event the accused could have been put to a choice as to which counsel he preferred to represent him at the deposition. We see no error in the military judge's conclusion that good cause was not demonstrated by the government for not postponing the deposition for a week in order to permit civilian defense counsel to be present.[15]

---

15. We are troubled, however, by what we con- sider to be an inadequate factual inquiry into

■ There remains, however, the question of whether Sergeant Hamilton was prejudiced by the absence of his civilian defense counsel from the deposition of Mr. Echalas. Even violations of constitutional rights do not require exclusion of evidence or other drastic remedies if it is demonstrated, beyond a reasonable doubt, they caused no harm to the rights of an accused. Article 59(a), UCMJ, 10 U.S.C. § 859(a); *United States v. Wattenbarger*, 21 M.J. 41 (C.M.A.1985), *cert. denied*, 477 U.S. 904, 106 S.Ct. 3272, 91 L.Ed.2d 563 (1986); *United States v. Remai*, 19 M.J. 229 (C.M.A.1985); *United States v. Marsh, supra; United States v. Gipson, supra; United States v. Freedman, supra.* The military judge properly put the burden of proof on this issue on the prosecution, but then he improperly refused to consider the evidence it offered, most notably the transcript of the deposition itself. The resulting finding was clearly erroneous, as it was not based on the evidence of record.

It is therefore ORDERED:

(1) The government's appeal of the military judge's ruling excluding from evidence the deposition of Mr. Echalas is GRANTED, and the ruling is set aside.

(2) If the prosecution renews its motion for the admission of the deposition of Mr. Echalas taken in Manila, the Philippines, on 4 November 1992,[16] the military judge is instructed:

(a) to review the issue of Mr. Echalas' availability to testify at trial, consistent with this decision (taking into consideration the witness' willingness or refusal to appear at that time and the reasonableness of efforts by the government to arrange for his presence), and to make new essential findings concerning the availability of Mr. Echalas as a witness;

(b) to review all the evidence of record, and any additional relevant evidence submitted by the parties, bearing on the issue of whether any substantial right of Sergeant Hamilton was prejudiced by the absence of his civilian defense counsel from the deposition, and to make essential findings concerning the presence or absence of such prejudice;

(c) to reconsider the admissibility of the deposition consistent with the military judge's findings in compliance with paragraphs (a) and (b) above, and consistent with this decision.

Senior Judge LEONARD and Judge JAMES concur.

---

the basis for the military judge's finding that the civilian defense counsel was unavailable. The military judge accepted on its face the civilian defense counsel's representation that he needed another week to rearrange his office calendar, without making any inquiry whatever into the facts. The military judge did not ask the civilian defense counsel what events he needed to reschedule. This seems an especially unlikely oversight because the government represented that the real reason for the defense request for delay was so the civilian defense counsel could book his airline tickets to Manila with enough lead time to qualify for a lower ticket price. We also note the judge accepted on its face the representations of the civilian defense counsel that he was unable to work on rescheduling his calendar during a week when he was performing duty at MacDill Air Force Base as a Reserve judge advocate. Considering that counsel's practice and the site of his Reserve duty were in the same city, a 30–minute drive apart, that counsel's duty day as a Reserve judge advocate was over at 1630, and that he had breaks during the day when he could make telephone calls, it seems remarkable that the military judge accepted without question the civilian defense counsel's representation that he was unable to work during this period on clearing his calendar. The process of balancing interests entrusted to military judges can work properly only when the military judge makes a thorough inquiry into the relevant facts.

**16.** The record indicates the parties are attempting to arrange for another deposition of Mr. Echalas to be conducted at a location outside the Philippines. If this effort results in the taking of a deposition of Mr. Echalas at which Sergeant Hamilton is represented by counsel of his choice, it is possible the prosecution may not renew its motion for the admission of the first deposition.