UNITED STATES, Appellee,

v.

Specialist Four Pamela D. NELSON,
466–86–0122, United States
Army, Appellant.

ACMR 8702788.

U.S. Army Court of Military Review.

28 Feb. 1989.

For Appellant: Lieutenant Colonel Russell S. Estey, JAGC, Major Eric T. Franzen, JAGC, Captain Stephanie C. Spahn, JAGC (on brief).

For Appellee: Colonel Norman G. Cooper, JAGC, Lieutenant Colonel Gary F. Roberson, JAGC, Major Kathryn F. Forrester, JAGC, Captain Mark E. Frye, JAGC (on brief).

Before HOLDAWAY, THORNOCK and CARMICHAEL, Appellate Military Judges.

## OPINION OF THE COURT

CARMICHAEL, Judge:

In a noncapital case, a general court-martial consisting of officer and enlisted members convicted appellant of premeditated murder, in violation of Article 118, Uniform Code of Military Justice, 10 U.S.C. § 918 (1982) [hereinafter UCMJ]. She was sentenced to a dishonorable discharge, confinement for life (which is a mandatory punishment for premeditated murder), and reduction to Private E–1. The convening authority approved the sentence.

Appellant asserts error on the basis that the prosecution failed to prove its case beyond a reasonable doubt. She argues that the government's evidence was insufficient to negate her defense of self and, alternatively, that it failed to prove premeditation on her part. We find no deficiency in the government's evidence on either score and affirm.

The evidence is uncontroverted as to the following facts supporting the members' findings. The appellant and the victim, a male sergeant, had been dating for five months without incident. The victim had never struck or hurt her during that time. Although the appellant testified that immediately before she stabbed him the victim hit her and attempted to strangle her, she

sustained no bruises or lacerations evincing such an attack. She had no bruises, lacerations, or marks on her face, neck, or chest. The victim was in her bedroom when she stabbed him. To allegedly defend herself, the appellant was able to take approximately thirteen steps from her bedroom to the kitchen drawer where the knife was located, open the drawer and grab the knife, return to the bedroom with it, and stab the victim before he followed from the bedroom. His body was found, fully clothed, face down, just inside her bedroom doorway. His head was facing the doorway and his car keys were by his right hand. As was obvious from the physical evidence, the appellant testified that the victim did not chase her into the kitchen. She also testified that she could have left the apartment, but was scared, in her bathrobe, and did not think she should have to leave when she had told the victim to leave.

It was a warm evening and one of the appellant's bedroom windows was open. Persons sitting outside her first floor apartment, approximately thirty feet away from the bedroom windows, heard nothing until the appellant started screaming the victim's first name. However, five minutes before that they had seen a woman friend of appellant's enter the building. The friend was there when they entered the appellant's apartment after hearing her scream the victim's name. The appellant called this friend, apparently after the stabbing, to ask for "help" with the victim. During the homicide investigation, the knife used by the appellant was found in her kitchen trash can under a food wrapper. Appellant did not remember how she had stabbed the victim or what had occurred after the stabbing. Her apartment showed no signs of a violent struggle.

The appellant was five-feet-five while the victim was six feet tall. Yet, despite the disparity in height, the appellant stabbed the victim in the upper left chest at a steep angle. The knife was wielded with considerable force, cutting through the victim's

heart, his diaphragm, and penetrating his liver. The nature of the wound, which was sixteen centimeters in length, and the lack of any cuts on the victim's hands or arms, indicated that the victim had made no effort to defend himself. He was stabbed only once.

Most of the defense evidence consisted of the appellant's testimony in support of self-defense and a lack of premeditation, and the testimony of others concerning her hysteria, anguish, laments, and exculpatory behavior after the stabbing.

The military judge properly instructed the members concerning premeditated murder and the lesser offenses raised by the evidence, as well as self-defense. The members heard the witnesses, observed their demeanor, evaluated their relative credibility, and found the appellant guilty of premeditated murder. Because of their superior position, their determination should not be lightly regarded. *See United States v. Frierson*, 43 C.M.R. 292, 294 (C.M.A.1971). Here, we are satisfied that their determination of guilt is well supported by the evidence of record. *Cf. United States v. Viola*, 26 M.J. 822, 829–30 (A.C.M.R.1988).

■ We note the absence of a pretrial advice in the record, but see evidence that one was prepared in the "Direction of the Convening Authority," dated 10 September 1987. This document reflects that the convening authority approved the staff judge advocate's recommendation, referring the case for trial by general court-martial and directing that it be tried as a noncapital case. Testing for prejudice, we find none. *See United States v. Murray*, 25 M.J. 445 (C.M.A.1988) (Chief Judge Everett concurring in part and dissenting in part).

■ We are not unmindful of the rigidity of mandatory or fixed sentences. Having found the appellant guilty of premeditated murder, the members were precluded from deciding on an appropriate term of confinement. Life imprisonment was mandatory.[1]

---

1. Jury nullification is never far from the surface when members learn that life imprisonment is a mandatory punishment for premeditated mur-

der. Learning during sentencing that life imprisonment is a legislatively predetermined punishment for the offense, members may, because

UCMJ art. 118. The convening authority, although petitioned to do so by the defense, chose not to exercise his clemency powers by reducing the confinement. The gravity of a murder committed with premeditated design needs no elaboration. Moreover, it is difficult to identify any prevalent philosophy of penology in view of the epidemic of violent crime woven into the very fabric of urban America. Rehabilitation may be a legitimate sentencing goal in the public's mind but, in the wake of increasing violence, citizens are demanding a criminal justice and correctional system that protects them. Thus, the public's attention is focused on effective means of deterring violent crime. In this regard, the concerns of military and civilian households are one. Lengthy confinement of a mandatory nature may or may not be an effective deterrent. A prisoner may serve the full mandatory term or he or she may be released on parole.

In the appellant's case, although she is serving a life sentence, she becomes eligible for parole after *not more than* ten years [2]. It is probable then, absent further misconduct while incarcerated, that she will be released on parole soon after becoming eligible. The legislature has determined, based solely on the crime of which she was convicted, that she should be sentenced to life imprisonment. We do not challenge this determination or the authority to make it, but must fulfill our judicial responsibility to review the sentence for appropriateness. We must consider mitigating as well as aggravating factors; the individual offender as well as the crime.[3] Further, the goal of rehabilitation cannot be ignored by this court in completing its sentence review. This would result in the automatic affirmance of Draconian punishments. Offenders in military correctional facilities are to be usefully employed "with a view to their restoration to duty, enlistment for future service, or return to civilian life as useful citizens" 10 U.S.C. § 951 (1982). Based on our review of the entire record in appellant's case, we conclude that a sixty-year term of confinement is appropriate.

Accordingly, we affirm the findings of guilty and only so much of the sentence as provides for a dishonorable discharge, confinement for sixty years, and reduction to the grade of Private E-1.

Chief Judge HOLDAWAY and Senior Judge THORNOCK concur.

---

of the severity of the punishment relative to the circumstances of the case, propose reconsideration of the findings and vote to convict of a lesser included offense. *See United States v. Duffy*, 47 C.M.R. 659 (A.C.M.R.1973) (members reconsidered premeditated murder conviction after learning of mandatory punishment and found accused guilty only of involuntary manslaughter). In our opinion, a mandatory minimum term of confinement with a ceiling of life imprisonment would provide members with sufficient discretion during their sentencing deliberations, and thus constitute a significant step toward eradicating jury nullification.

2. Generally, military prisoners confined for life or more than thirty years are eligible for parole consideration as determined by the Army Clemency Board. They will not be considered, however, until they have served at least one year of confinement, and will be considered, if not sooner, after ten years. Where "exceptional circumstances" exist, the Army Clemency Board may waive parole eligibility requirements. *See* Army Regulation 190–47, The United States Army Correctional System, para. 12–5 (1 Oct. 1978) (C1, 1 Nov. 1980).

3. We also note that a life sentence precludes good conduct time abatement which is credited to a prisoner as the sentence to confinement is served. For a sentence of ten years or more, the rate of abatement for good conduct is ten days for each month of the sentence. Army Regulation 633–30, Apprehension and Confinement, Military Sentences to Confinement, para. 13(e)(6 Nov. 1964) (C5, 28 Apr. 1976).