**UNITED STATES, Appellee,**

v.

**Clifford B. HUBBARD, Private, U.S. Army, Appellant.**

No. 50,491.
CM 443159.

U.S. Court of Military Appeals.

March 10, 1989.

For Appellant: *Clinard J. Hanby,* Esq. (argued); *Richard Haynes,* Esq., and *Captain Robert S. Johnson, Jr.* (on brief); *Jack B. Zimmermann,* Esq., *Lieutenant Colonel William P. Heaston, Major Eric T. Franzen, Captain Michael Graham, Captain Harry L. Williams, Jr., Captain Annamary Sullivan.*

For Appellee: *Captain Richard G. Mann, Jr.* (argued); *Colonel James Kucera, Lieutenant Colonel Adrian J. Gra-*

velle, *Lieutenant Colonel Larry D. Williams* (on brief).

### Opinion of the Court

EVERETT, Chief Judge:

A general court-martial composed of officers tried Hubbard at Fort Shafter, Hawaii, on charges that he had murdered, sodomized, and committed indecent acts with a child under 16 years of age, in violation of Articles 118, 125, and 134, Uniform Code of Military Justice, 10 USC §§ 918, 925, and 934, respectively. The murder was alleged in separate specifications as both premeditated murder and felony-murder committed in the perpetration of sodomy.

Hubbard pleaded not guilty to all the charges; but he was convicted of unpremeditated murder; felony murder; attempted sodomy, in violation of Article 80, UCMJ, 10 USC § 880; and committing indecent acts. The court-martial sentenced him to a dishonorable discharge, confinement for life, and total forfeitures. The convening authority approved these results, and the Court of Military Review affirmed the findings and sentence. 18 MJ 678 (1984).

Thereafter, this Court granted review on these three issues:

### I

WHETHER THE MILITARY JUDGE DENIED THE APPELLANT HIS RIGHT OF CONFRONTATION BY ADMITTING THE OUT OF COURT STATEMENTS RENDERED BY THE ACCOMPLICE, PRIVATE COURTNEY.

### II

WHETHER THE EVIDENCE IS INSUFFICIENT TO SUSTAIN THE FINDINGS OF GUILTY BECAUSE THEY WERE BASED UPON THE UNCORROBORATED TESTIMONY OF THE ACCOMPLICE WITNESS COURTNEY, WHOSE TESTIMONY WAS SELF-CONTRADICTORY, UNCERTAIN, AND IMPROBABLE.

### III

WHETHER THE MILITARY JUDGE ERRED IN FAILING TO DISMISS SPECIFICATION 1 OF CHARGE I (MURDER) AS MULTIPLICIOUS FOR FINDINGS WITH SPECIFICATION 2 OF CHARGE I (FELONY MURDER).

We rule against appellant on the first two issues and for him on the third.

### I

### Evidence at Trial

On the merits, the Government's evidence commenced with the testimony of Lieutenant Colonel K, who testified that on Friday, February 5, 1982, his twin sons, Derek and Dominic, age 14, had stated that they wanted to go bowling. They were told to return about 9:30 p.m., and no later than 10:00 p.m. Dominic returned; Derek did not. At 11:00 p.m. Lieutenant Colonel K called the military police, and he continued to search for Derek through the night. The next evening, he was called to identify his son's body.

Derek had been in good health when he left that evening to go with his brother to the bowling alley. However, he suffered from a life-long asthmatic condition and was allergic to pollen and tall grass. Derek wore glasses, which his father—who was an optometrist—had prescribed.

Dominic testified that, after he and Derek had arrived at the bowling alley, his brother had some trouble with his asthma and went outside three or four times to get fresh air. Finally, Derek, who did not have his asthma medication with him, left the bowling alley around 8:30 p.m. The brothers agreed to meet at home about 9:00 p.m., but Dominic never saw his brother again. Before that evening, Dominic had seen Derek smoke marijuana on one occasion.

Steve Savage, a 17–year–old, had been at the bowling alley on the evening of February 5; and at 10:15 p.m. he saw Derek walk in, get a drink of water, and then leave

through a side exit in the direction of the nearby Enlisted Men's Club. At 11:00 p.m., as Savage proceeded from the bowling alley in the same direction, he saw no one outside the Club.

Private Duane Reynolds testified that in mid-January he went with Specialist Thomas Spindle, a co-accused, and PFC Joseph Courtney to an abandoned bunker at Schofield Barracks. Later that same day, he attempted to go back to the bunker with Spindle, Courtney, Specialist Wilson, Private Hanson, and Hubbard. However, they were turned away by the military police. Reynolds, a member of appellant's company, lived in a barracks about a 10 to 15 minute walk from the bunker. Between 2:30 and 3:00 p.m. on February 5, Spindle asked Reynolds if he "wanted to go to the bunker"; but he declined.

The next government witness, Special Agent Steinbarger of the Criminal Investigation Command (CID), testified that he had received notification shortly after 5:00 p.m. on February 6 that a boy's body had been found in a bunker at Schofield Barracks. This bunker—sometimes also referred to by the witnesses as a "bomb shelter"—was located on a small grassy hill. According to Steinbarger, the bunker had a reputation as a place used frequently for smoking marijuana. Two fairly large trees were about 120 feet away. Between the trees was a small, dirt area. Also near the trees was some tall grass. Steinbarger had been informed by Specialist Lietz, a military policeman, that when he went to the bunker, he had been met by four individuals. One of them was "Spindle who allegedly had initially found the body and notified him."

A stairway with 44 steps led into a bunker at a forty-five degree angle. On step 17 or 18 from the top were some trousers with a pair of underwear inside; on step 33 or 34 was a blue jacket; and at the bottom of the stairway Derek's body was lying face down. His socks were rolled down to the ankles; and Steinbarger could only see the white part of the socks. Derek's glasses were found under his body.

In the dirt area under the trees there were "some marks ... as if someone had" been lying there and had moved his "feet backwards." The grass, which was 12 to 24 inches tall, was "matted down"—especially in a four-foot by six-foot area—as if someone had been lying there recently. In the grassy area there was an identification card that had belonged to Derek. Two days later, Steinbarger found a knife with a three- to four-inch blade in a dirt area close to the tall grass.

Derek's body was dirty and displayed "numerous injuries." Under the foreskin of his penis, there was "a green blade of grass." When Derek's "basketball-type socks" were rolled up to his knees, "three colored stripes—blue, red, and blue"—were displayed, which ran "from top to bottom." However, initially no color had been visible because the socks were "rolled down to the ankles." At first, Spindle was the only suspect, and he had listed Reynolds, Courtney, and Hubbard as his alibi witnesses.

Doctor Wong, a forensic pathologist, had examined Derek's body and found many fresh injuries on his forehead, face, and elsewhere. These injuries were "consistent with" the body's having been "dragged along the ground or pushed back and forth on the ground." There also were injuries on the foreskin of the penis. According to this expert, most of the injuries had been inflicted prior to death, although some might have been received subsequent thereto.

In the opinion of Dr. Wong "the cause of death was ... asphyxia due to suffocation"; but there was no indication that Derek died from or had suffered an asthma attack. Instead, he had not been able to breathe because a hand or some other foreign object had been applied to his mouth and nose. Death had been the result "of a violent act ... by one or more persons." According to Dr. Wong, death normally would result in 3 to 5 minutes from a hand being placed over the nose and mouth, but this period might be shortened if the victim experienced an asthma attack or had an

allergy problem, or if someone had been sitting on his chest while he struggled.

Dr. Wong did not find sperm in the anal tract or tears or rips in that area; but in his opinion, this absence of sperm and injury did not establish that anal sodomy had not occurred. There was a bite mark in the area of the left nipple which probably had been made 2 to 6 hours before Derek died, although possibly the bite could have occurred at any time up to death. Dr. Wong saw "abrasions" on the penis and scrotum area and a small piece of grass "leaf between the foreskin and the head of the penis." A metabolite of marijuana—tetrahydrocannabinol (THC)—was found in Derek's blood.

Private Courtney absented himself without leave several days prior to the beginning of trial, and intensive efforts to find him proved fruitless. After the military judge ruled that Courtney was unavailable to testify, trial counsel read Courtney's former testimony given at the investigation conducted under Article 32, UCMJ, 10 USC § 832. Initially, Courtney had testified on March 16 that he had not gone to the bomb shelter on February 5 and did not know whether Hubbard or Spindle had been there. In light of his previous sworn statements to the CID, the investigating officer warned Courtney about the danger of prosecution for false official statements and asked if he wanted to consult with a lawyer. When the witness responded in the affirmative, the hearing was recessed.

When the hearing resumed 2 days later, Courtney was willing to testify without an attorney. He stated that on February 5 he went to "the bomb shelter" with Spindle and Hubbard, with whom he had smoked marijuana in the past. The three soldiers had a flashlight; and they intended "[t]o enter the bunker." Spindle had said that he had been there before "[a] couple" of times; and Courtney himself had been there once with Spindle, although not with Hubbard.

Courtney had gotten off duty about 10:00 p.m. and had changed clothes before they departed for the bunker about 10:30.

En route there, they had encountered a boy [Derek] outside the Enlisted Men's Club. He was sitting on the curb by the street, and they "asked him if he wanted to go get high with us." The boy accepted the invitation.

They soon reached "a big tree" on the hill near the bunker and smoked marijuana. This was some time after 10:30. They smoked for about 10 minutes before Hubbard and Spindle started wrestling. Next "they started pushing me [Courtney] and the kid around." The boy was wrestling with Hubbard and Spindle on the ground; and then Hubbard sat on his "chest and told Spindle to pull the boy's pants down.... Spindle did so, and ... Hubbard [then] rolled the" boy "over on his stomach.... Spindle held his shoulders and ... Hubbard started" what seemed to be "rectal intercourse." However, Courtney did not see actual penetration of Hubbard's penis into Derek's anus.

The boy "attempted to scream ... and ... Spindle covered his mouth" with his hand. The scream was "never finished." When Courtney attempted to intervene, Hubbard pushed him down. At that point, Courtney was in poor condition—or, in his terms, "buzzed to the max." Three times Courtney "told [them] to stop, but ... Hubbard told [him] just to shut up, [and] knocked [him] back." Moreover, Hubbard brandished something that looked to Courtney like a knife; and he threatened to kill Courtney if he left. At some point, Hubbard had pulled down the zipper of his pants.

Ultimately, the boy "freaked out" and went into what looked to Courtney like an epileptic seizure. Then "he just stopped moving"—whereupon, Courtney "pushed ... Spindle out of the way," knocked Hubbard off the boy, and took his pulse. He found none and told the others, "[H]e's dead."

Thereafter, Hubbard gave Courtney a flashlight "and told ... Spindle to pick up the" boy's hands. Hubbard grabbed his ankles, and he and Spindle carried the body into the bunker, while Courtney "stayed at

the top" of the stairway "and held the flashlight." They did not "take the body all the way down to the bottom" but, instead, let it roll down the last quarter of the stairway. When Hubbard and Spindle came back up the stairway, Courtney "threw the flashlight at ... Hubbard," ran back to his barracks room, and closed the door. Courtney related that he did not call the military police, because he was afraid for his own life and because Hubbard had already threatened him during the struggle with the boy.

Between February 10 and 17, Courtney had made several inconsistent sworn statements to CID agents. He conceded that, before going to the bunker on February 5, he had smoked a bowl of marijuana and for many years he had smoked marijuana on a daily basis. Indeed, 95 percent of his pay went for this purpose. However, he claimed that he had just stopped using this substance because of "[t]his" incident.

Chief Warrant Officer Mills, a forensic serologist, testified that in his opinion there was upward to an 80 percent chance that hairs found on Derek's clothing had come from Spindle's head. In addition, some hairs seized from clothing in a laundry bag in Hubbard's room probably had come from Spindle's head.

After the Government rested, the defense offered testimony that Courtney had a poor reputation for truthfulness. There was also some evidence which tended to contradict Courtney's recital of events and to establish an alibi for Hubbard. Finally, there was expert testimony from Lieutenant Colonel O'Neil—a dentist who had taken a one-week course in forensic odontology—

that the bite mark on the victim's chest was not consistent with dentitions of Hubbard, Spindle, or Courtney.[1]

A brief case-in-rebuttal was presented by the Government, and four witnesses were called at the court's request to clarify certain details.

## II

### *Admissibility of Former Testimony*

Trial defense counsel objected on several grounds to admissibility of Courtney's Article 32 testimony. First, they contended that Courtney's unavailability had not been established. In their view he was absent because of negligence on the part of the prosecution, so his former testimony would be inadmissible in evidence. *Motes v. United States*, 178 U.S. 458, 20 S.Ct. 993, 44 L.Ed. 1150 (1900).

When former testimony is offered, this Court has insisted that unavailability of the absent witness be clearly established— as demanded by Mil.R.Evid. 804(b)(1), Manual for Courts–Martial, United States, 1969 (Revised edition) and the Sixth Amendment. *See, e.g., United States v. Burns*, 27 MJ 92 (CMA 1988); *United States v. Barror*, 23 MJ 370, 373 (CMA 1987); *United States v. Cokeley*, 22 MJ 225, 228 (CMA 1986); *United States v. Crockett*, 21 MJ 423 (CMA), *cert. denied*, 479 U.S. 835, 107 S.Ct. 130, 93 L.Ed.2d 74 (1986). This requirement is especially rigorous when, as here, the absent witness is crucial to the Government's case and has been impeached in various ways. *See United States v. Burns, supra* at 98.[2]

■ In this case, however, we perceive no error in the military judge's ruling that

---

1. As to admissibility of expert testimony concerning bite marks, *see United States v. Martin*, 13 MJ 66, 67–68 (CMA 1982).

2. Apparently, the requirement for establishing unavailability may be lessened where the evidence is very trustworthy. Thus, the Supreme Court has commented:

 A demonstration of unavailability, however, is not always required. In *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), for example, the Court found the utili-

ty of trial confrontation so remote that it did not require the prosecution to produce a seemingly available witness. *Cf.* Read, The New Confrontation— Hearsay Dilemma, 45 S.Cal.L.Rev. 1, 43, 49 (1972); The Supreme Court, 1970 Term, 85 Harv.L.Rev. 3, 194–195, 197–198 (1971).

*See Ohio v. Roberts*, 448 U.S. 56, 65 n. 7, 100 S.Ct. 2531, 2538 n. 7, 65 L.Ed.2d 597, 607 n. 7 (1980).

Courtney was unavailable. The Government established that, about 2 weeks before trial, Courtney had left his unit without authority in the company of another soldier. Apparently at the time of his departure, he had stolen money to assist his flight. A fellow soldier took the two men to the airport, and Courtney had stated that he would be buying a one-way ticket to the mainland. Law-enforcement agencies both in Hawaii and on the mainland had been notified of his departure and had searched diligently for him, but without success. There was no indication when, if ever, he would return to Hawaii—voluntarily or involuntarily.

Admittedly, Courtney's company commander had somewhat relaxed the very tight control initially exercised over this witness. This relaxation was not attributable to negligence but to Courtney's good behavior and apparent cooperation. If Courtney had been placed in confinement pending the trial of Spindle and Hubbard, his availability could have been fully assured. However, it would be anomalous to require that military authorities keep Courtney, the witness, under lock and key pending the trial of two soldiers who themselves had been released from pretrial confinement.

In any event, we conclude that, under the circumstances here, military authorities were not negligent because they failed to anticipate that Courtney would violate the Uniform Code by fleeing without authority to the mainland and remaining absent thereafter. Likewise, we perceive no deficiency in the vigorous efforts made by the Army to regain custody of Courtney after he had fled.

The other attacks on admissibility of Courtney's testimony have largely been disposed of by our recent decision in *United States v. Connor*, 27 MJ 378 (CMA 1989). There, we rejected a contention that former testimony taken at a pretrial investigation is later inadmissible at trial if the "motive" of defense counsel during cross-

examination was to discover evidence, rather than to impeach the witness. Of course, in this case, it is apparent from the questions propounded by defense counsel for Hubbard and Spindle at the Article 32 hearing that one of their objectives was to impeach Courtney.

The defense also complains that, before Courtney testified during the Article 32 investigation, they had requested the Government to provide various types of information which, if they had been made available, would have been useful in the cross-examination of Courtney. For example, defense counsel claim that if, at the time of the Article 32 hearing, they had known what would be Dr. Wong's final opinion as to the cause of Derek's death, they would have posed additional or different questions to Courtney.

If the Government had intentionally suppressed exculpatory information that could have been used in questioning Courtney, the defense claim would have merit on due-process grounds. *Cf. United States v. Connor, supra; United States v. Eshalomi*, 23 MJ 12 (CMA 1986). However, so far as we can determine from the record, the prosecution did not hold back from the defense information which it had already acquired. Instead, the Government continued to investigate and to obtain evidence even after Courtney had testified at the Article 32 hearing; and this evidence was promptly made available to counsel for Hubbard and his co-accused.[3]

 As we made clear in *Connor*, admissibility of former testimony is not precluded because, after the giving of that testimony, material information is obtained as to which the defense had no opportunity to cross-examine the absent witness. *Cf. Mattox v. United States*, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895). The Sixth Amendment demands that an accused be allowed an opportunity for face-to-face confrontation. *Cf. Coy v. Iowa*, 487 U.S. ——, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988)

---

**3.** There is no indication that the defense made a request that the Article 32 investigation be re-

opened to take additional testimony from Courtney.

(without any intervening screen or partition).[4] However, the right of confrontation does not require that former testimony be given at a time when a witness recalls all the information that the cross-examiner wishes him to remember,[5] *cf. Delaware v. Fensterer*, 474 U.S. 15, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985); or when the cross-examiner does not have at his disposal all the information as to which he would like to cross-examine the witness, *cf. Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987).

The defense also contends that the former testimony of Courtney was so demonstrably unreliable as to preclude its admissibility. By his own admission he had given several false statements to the CID under oath. He had smoked marijuana excessively for 9 years and was "high" on the evening of February 5—with a resulting diminution in his powers of observation. He had himself dealt in drugs and was guilty of various infractions of military law. He had a poor reputation for truthfulness, and he had demonstrated his lack of responsibility by his unauthorized absence immediately prior to an important trial in which he was to be a material witness.

■ Nonetheless, the general rule is that—just as for a witness testifying in the courtroom—a witness' prior inconsistent statements, prior convictions, and poor reputation for trustworthiness do not require excluding or striking his testimony. This rule accords with the principle that factual reliability does not have to be established as a prerequisite for admitting hearsay evidence pursuant to well-recognized hearsay exceptions. *See Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed. 2d 144 (1987). "Reliability can be inferred without more in a case where the evidence

falls within a firmly rooted hearsay exception." *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608 (1980). Even though the factfinders are at a disadvantage because they cannot see the witness' demeanor—unless, of course, the prior testimony has been videotaped—they still are given the task of deciding what weight should be given to the testimony of the absent witness.

■ Judge Cox has intimated in *United States v. Burns*, 27 MJ at 98 (Cox, J., concurring in the result), that former testimony taken at an Article 32 investigation might be so patently unreliable that, on constitutional grounds, it should be excluded. Even if this proposition is accepted, the present case is not one to which it applies. Far from being patently unreliable, Courtney's former testimony was unwavering, despite extensive cross-examination. Moreover, it was extensively corroborated by physical evidence and by the testimony of other witnesses. Finally, the military judge gave the members comprehensive instructions about the use of the former testimony, so that they would understand that it had been received out of necessity and should not be given any special weight. *Cf. Lakeside v. Oregon*, 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978); *United States v. Ricketts*, 1 MJ 78, 82 (CMA 1975).

### III

### *Sufficiency of the Evidence*

According to Courtney's testimony, he never shared the criminal purpose of Hubbard and Spindle. Instead, he only went to the bunker to smoke marijuana and get high. However, the court members might reasonably have inferred that Courtney was more culpable than he admitted.

---

4. The possible value of such confrontation is apparent in this very case. On March 18, Courtney testified that, 2 days before, he had given false testimony during the Article 32 investigation because Spindle and Hubbard had been present and their facial expressions had frightened him.

5. "Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985).

With this in mind, the military judge instructed the members that they should consider accomplice testimony with caution and that an accused should not be convicted on the uncorroborated testimony of an accomplice, if that testimony was self-contradictory, uncertain, or improbable.

Far from being self-contradictory, uncertain, or improbable, the former testimony given by Courtney on March 18 during the pretrial investigation would seem coherent and consistent to many who might read the record of trial. However, the testimony given on that date was at odds with the brief testimony that Courtney gave on March 16, when he denied having been at the bunker on the evening of the homicide. Therefore, if we assume *arguendo* that Courtney was an "accomplice," it could be reasoned that corroboration was required.

■ If so, that requirement was amply met. Much of the physical evidence at the scene corroborated Courtney's testimony. Likewise, it was supported by the expert testimony of Dr. Wong concerning the circumstances and cause of Derek's death.

---

6. Appellate defense counsel did not raise any question as to the possible multiplicity of the convictions for sodomy and for committing indecent acts. Therefore, we need not discuss that issue.

## IV

### Multiplicity of Charges

■ We have held previously that, if the same homicide is the subject of findings of premeditated murder and felony murder, one should be set aside. *United States v. Teeter*, 16 MJ 68 (CMA 1983). Clearly, that principle applies where, as here, there are convictions of unpremeditated murder and felony murder.[6]

Since a life sentence is mandatory only for felony murder, Art. 118, we will dismiss the unpremeditated-murder specification. This action does not warrant any relief as to sentence.

## V

The decision of the United States Army Court of Military Review is reversed as to specification 1 of Charge I. The finding of guilty thereon is set aside, and that specification is dismissed. In all other respects, the decision below is affirmed.

Judge COX concurs.

Judge SULLIVAN did not participate.