UNITED STATES

v.

**Technical Sergeant Gerald I. MOBLEY, FR 565–86–1085, United States Air Force.**

**ACM 26528.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 2 Sept. 1988.

Decided 18 July 1989.

**1026**

Appellate Counsel for the Appellant: William J. Holmes, Virginia Beach, VA; Colonel Leo L. Sergi; Major Frank J. Spinner and Captain Henry J. Schweiter.

Appellate Counsel for the United States: Colonel Joe R. Lamport; Lieutenant Colonel Robert E. Giovagnoni; Major Kathryn I. Taylor and Major Jeffrey H. Curtis.

Before LEWIS, BLOMMERS and KASTL, Appellate Military Judges.

## DECISION

LEWIS, Senior Judge:

The appellant pleaded not guilty to attempted rape and premeditated murder committed while attempting to perpetrate the offense of rape. Both murder theories (premeditated and felony murder) were alleged in one specification. He was found guilty following a trial before members. These findings, having been announced as unanimous for murder, subjected the appellant to a possible capital sentence. R.C.M. 1004(a)(2). However, he was sentenced by the members to the mandatory minimum punishment of life imprisonment. Article 118, UCMJ, 10 U.S.C. § 918; MCM, Part IV, paragraph 43e(1) (1984). Other punishment elements were a dishonorable discharge, forfeiture of all pay and allowances and reduction to airman basic. The general court-martial convening authority approved the sentence with the exception of total forfeitures. The forfeiture was reduced to $300.00 per month for 16 months.

The operative facts, as briefly summarized, reflect that the victim, identified herein as C.T., was the 25 year old dependent wife of an airman first class. She was employed as a cashier at the Noncommissioned Officers' Open Mess, Bergstrom Air Force Base, Texas. Late on the evening of 7 February 1987, she was discovered unconscious, the apparent victim of a beating, sexual assault and strangulation, in the front section of her automobile which was parked in the Open Mess lot. Her body was transported to the base medical facility and, subsequently, to a larger hospital in Austin, the adjacent civilian community. There, C.T. was examined and determined to be "brain dead." The next day, following consultation with her husband and father, medical personnel terminated life support efforts.

A receipt found in the front seat of the automobile contained the appellant's name. While this item was removed from the vehicle the day after the incident by a civilian police detective, it was apparently overlooked for a period of time as other items were being examined. When the significance of the receipt was recognized, agents of the Office of Special Investigations, working in cooperation with Austin City Police detectives, targeted the appellant as

a subject of their investigative efforts. The appellant was assigned to George Air Force Base, California, but he had been attending a Noncommissioned Officers' Academy course at Bergstrom when the offense occurred. The appellant was linked to the scene of the offense by circumstantial evidence including the aforementioned receipt, forensic analyses of a seminal fluid stain in the automobile and of pubic hair samples located nearby, the typing and comparison of blood samples found at the crime scene and on clothing belonging to the appellant, the dusty imprint on the car window of the sole of a shoe similar in design to shoes owned by the appellant, and expert identification of a bloody palm print on a sheet of paper in the deceased's car as matching a known print of the appellant.

■ We conclude that the evidence produced at trial is legally sufficient to support the findings of guilty returned by the members. Based on our review of the record, we are convinced of the appellant's guilt beyond a reasonable doubt. The appellant has assigned eight errors, several of which have been orally argued by counsel. Three of the assigned errors merit discussion. We affirm with modification of the findings for reasons set forth herein.

### Release of Automobile to Victim's Husband

■ Appellate defense counsel argue that the appellant's right to an equal opportunity to examine evidence, as provided by the Sixth Amendment and Article 46, UCMJ, 10 U.S.C. § 846, was violated when the automobile in which the victim's body was found was released by Austin police to the victim's husband without notice to the defense. The record discloses that the civilian police authorities and agents of the Air Force Office of Special Investigations were coordinating their investigative efforts when custody of the vehicle was relinquished. At trial, the defense moved to suppress all items of evidence obtained from the vehicle as well as testimony based on visual inspections of the vehicle. The motion was denied. This was unquestionably a key issue at trial, inasmuch as the bulk of incriminating evidence against the appellant was located in the vehicle or was derived from evidence located therein.

The essential findings of fact by the military judge are supported by the evidence presented on the motion. Briefly stated, the vehicle was towed from the parking lot adjacent to the Noncommissioned Officers' Open Mess to a police impoundment lot off base. The following day, 8 February 1987, the interior of the vehicle was examined in great detail, and numerous items of evidentiary value were removed and catalogued. Additionally, various blood splatter patterns were closely scrutinized and measured by a police detective having a good deal of expertise in this type of examination. During the earliest stage of the investigative process the victim's husband was viewed as a possible suspect. However, any suspicion directed toward him quickly dissipated. A little over a week after the vehicle was taken into police custody, the appellant's name surfaced because of the previously mentioned receipt found in the vehicle. Investigators interrogated him at George Air Force Base on 17 February. The appellant became the subject of the investigative effort at this point. He was placed in pretrial confinement at Bergstrom Air Force Base on 24 February and was formally charged on 25 February. The vehicle was released by Austin police authorities to the victim's spouse the same day.

While the record is not entirely clear on the matter of the appellant's representation by counsel, it appears that he consulted military counsel at some point following the 17 February interview. Defense counsel was not detailed until 25 February, the date the vehicle was released. The record clearly establishes that no request was made on the appellant's behalf for an opportunity to inspect the vehicle. On the other hand, it is equally clear that Austin police officials made no attempt to notify the appellant or a representative on his behalf of their intent to release the vehicle to the husband. Testimony presented in opposition to the motion indicated that there was no requirement nor standard

procedure that would have required the Austin police to provide such notice.

We shall not engage in a detailed comparison of the circumstances of this case with the leading precedents discussing the Government's obligation to provide evidence, whether apparently exculpatory or not, to the defense. *See Arizona v. Youngblood,* — U.S. —, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *United States v. Garries,* 22 M.J. 288 (C.M.A.1986), *cert. denied,* 479 U.S. 985, 107 S.Ct. 575, 93 L.Ed.2d 578 (1986); *United States v. Kern,* 22 M.J. 49 (C.M.A.1986); R.C.M. 703(f). Suffice it to say that we can find no evidence of bad faith on the part of the Government, including agents of the Office of Special Investigations who were maintaining a close liaison with the Austin police when the vehicle was released to A1C T. *United States v. Kern,* 22 M.J. at 52. Neither can we find any evidence of more than a speculative nature that the vehicle, if examined by representatives of the appellant, would have yielded any evidence of an exculpatory nature. *Ibid.* We conclude that the defense right to examine evidence, as outlined in the cited cases, was not violated by the release of the vehicle to the victim's surviving spouse.

■ We question whether the victim's vehicle is the type of evidence that is contemplated by the Sixth Amendment and Article 46, UCMJ, in any event. Both the defense, in a written motion to suppress, and the military judge, in rendering his essential findings, characterized the victim's vehicle as the "crime scene." We agree. The vehicle constituted something more than physical evidence removed from the scene of the crime. The vehicle was the crime scene itself. We know of no rule based on constitutional, statutory or case law which requires police authorities to preserve a crime scene until appropriate defense representatives have had the opportunity to examine it. Such a rule would be impractical in the extreme, particularly in a case in which the eventual accused at trial is not identified as a suspect until a considerable period of time has passed following discovery of the crime. Obviously, many crime scenes would be very difficult to secure for lengthy periods if such a rule were adopted.

■ Based on our analysis we find that the military judge correctly denied the motion to suppress. The appellant suffered no discernible prejudice from this ruling in any event. The police sergeant who made certain deductions based upon his examination of blood spatter patterns was available for cross-examination at trial. *United States v. Garries,* 22 M.J. at 292. A number of photographs depicting what the officer had observed were introduced as exhibits at trial. *United States v. Kern,* 22 M.J. at 52. The physical evidence actually removed from the vehicle and the forensic tests conducted thereon were available to defense representatives during the pretrial and trial process. *See generally* R.C.M. 703(f)(2). As previously noted, any benefit that might have resulted from a defense examination of the vehicle while it was in police custody is purely speculative.

### Introduction of Graphic Photographs of the Victim

■ We now examine an issue that frequently arises when a victim has been killed or suffered serious bodily injury allegedly as a result of an accused's criminal acts. In prosecuting its case the Government normally has a right to present evidence to the triers of fact of the harm which an accused has caused. As in the case before us, such evidence is often relevant to a material issue, e.g., that the victim, C.T., was killed as the result of intentional violence inflicted against her person. The evidence is often presented, at least in part, in the form of photographs of the injured or deceased person. The military judge in such instance has the task of balancing the extent to which such evidence will assist the triers of fact against the tendency of the evidence unduly to inflame the passions of the triers of fact. Mil.R.Evid. 403.

Case law has historically favored admissibility of photographic evidence, even

when its gruesome and graphic nature might upset the sensibilities of jurors. See the extensive citations gathered at Annotations, 73 A.L.R.2d 769 and 53 A.L.R.2d 1102, 1103–1105. The Court of Military Appeals has accorded trial judges broad discretion in admitting such evidence where the record supports findings that the photographs were offered for a legitimate evidentiary purpose and that their probative value outweighs the risk of unfair prejudice to the accused. *United States v. Yanke*, 23 M.J. 144, 145 (C.M.A.1987); *United States v. White*, 23 M.J. 84, 88 (C.M.A.1986); *United States v. Matthews*, 16 M.J. 354, 363 (C.M.A.1983); *United States v. Harris*, 6 U.S.C.M.A. 736, 21 C.M.R. 58, 66–67 (1956); *United States v. Bartholomew*, 1 U.S.C.M.A. 307, 3 C.M.R. 41, 48 (1952), and cases cited therein. On an infrequent occasion, an appellate court will hold that a military judge abused his discretion in allowing such evidence to be placed before the triers of fact. See *United States v. Coleman*, 36 C.M.R. 574 (A.B. R.1965), *pet. denied*, 36 C.M.R. 541 (1966), where the Army Board of Review held that the military judge abused his discretion in admitting four prosecution photographs of the victim's corpse portrayed with her intestines streaming from the vaginal orifice. The Board concluded that this evidence had a limited probative value in light of other evidence which adequately portrayed the viciousness of the assault which led to the victim's death.

In the case at hand the prosecution offered a number of photographs of the deceased during one of the early Article 39(a), UCMJ, proceedings. The military judge admitted most of the proffered photographs. However, in response to defense objections, he excluded: (a) two autopsy photographs showing right and left side views of the victim's exposed skull with the surgically reflected scalp pulled forward over her face; and (b) a photograph of the surgically exposed neck cavity. These photographs had been offered to depict certain

internal injuries she had allegedly received at the hands of the appellant, i.e., deep bruises from blows to the head in the first instance and major hemorrhaging from strangulation in the second instance.

The rejected photographs were proffered again by the prosecution at a later point in the trial. The two photographs of the victim's exposed skull were grouped into one exhibit along with four drawings depicting clusters of bruises, or contusions, to the victim's head. The photograph of the victim's neck cavity was displayed along with several other photographs including two of C.T.'s excised hyoid bone [1] which, according to expert testimony, was fractured on the left side. In making his initial ruling on the photographs, the military judge had considered a stipulation of expected testimony of a prospective prosecution witness, a forensic pathologist, to the effect that the photographs were necessary to assist in the members' understanding of his testimony. At the later point in the trial, the witness was available and testified in the Article 39(a) session concerning the significance of the proffered photographs. The military judge on this occasion admitted the exhibits over continuing defense objection. We must now consider whether he abused his discretion in doing so.

■ The military judge, in his ruling admitting the photographic exhibits, found they were relevant both on the merits, as proof that the victim died by strangulation, and in relation to one of the capital sentencing aggravation factors upon which the prosecution relied, i.e., that "the murder was preceded by the intentional infliction of substantial physical harm or prolonged, substantial mental or physical pain and suffering to the victim." R.C.M. 1004(c)(7)(I). [2] In admitting the exhibits the military judge asked that the witness explain in his subsequent testimony before the triers of fact "that the dissections involved to produce those photos were not caused by the accused, but were done by a surgeon on post

1. The hyoid is located at the base of the tongue.

2. The record reflects that the prosecution had provided the requisite notice as set forth in

R.C.M. 1004(b)(1). See also R.C.M. 1004(b)(5), which raises issues that we need not address in this decision.

mortem examination." This explanation was subsequently provided to the members in compliance with the military judge's request. This was a sound precaution. See the description of the autopsy photographs found to have been erroneously admitted in *People v. Burns,* 109 Cal.App.2d 524, 241 P.2d 308, 318–319 (1952).

### A

■ We first address the exhibit containing the photograph of the opened neck cavity. As previously noted, the military judge based his ruling, in part, on the relevance of the evidence to assist the Government to sustain its burden of proof on the merits. This photograph portrayed what the expert witness characterized as the greatest degree of internal hemorrhaging he had viewed in the course of approximately 1,500 autopsies. The photographic evidence of the hemorrhaging was relevant to demonstrate the likely degree of force utilized in strangling the victim. The witness was able to provide opinions, through this evidence along with other evidence of external abrasions to the victim's neck, as to the possible means by which the strangulation was accomplished.

We are satisfied that this particular exhibit was relevant to the issues of intent and premeditation. Whether it should have been placed before the triers of fact following a Mil.R.Evid. 403 balancing test is a matter about which reasonable people might differ. As appellate defense counsel correctly argue, the photograph in question would have been more helpful to the trier of fact if it had been accompanied by a photograph or other portrayal of the "normal" neck cavity of a cadaver. However, we will not predicate error on the fact that the prosecution might have organized the challenged exhibit in a manner to be of more assistance to the triers of fact than it was. We find that the military judge did not abuse his discretion in admitting the photograph of C.T.'s neck cavity.

### B

■ The admission of the exhibit containing the photographs of the victim's ex-posed skull presents a more difficult issue. It is necessary that we develop the record in more detail. In rendering findings in support of his ruling on this issue, the military judge stated that the pathologist "has testified that he requires [the photographic exhibit] to show and explain to the jury the force and directions of the blows administered to the head of the victim...." However, this finding is hardly in accord with his actual testimony. During the referenced testimony the witness had been asked by the military judge whether the photographs were necessary to assist him in communicating his opinions and conclusions to the triers of fact. The witness had replied as follows:

> Sir, I am sure I can get across anything that I need to say with words. It is always better from a practical point of view so that there is no question of misunderstanding, to have graphic representation. And if that were at all possible I would certainly want to go that way. I don't personally find a reflected scalp particularly obnoxious or inflammatory. I guess this is a pathologist looking at something quite differently from a lawyer or a judge. I don't know. I can certainly describe what happened, but I think that there is a better chance of complete understanding by all concerned who have to weigh all the facts if this material were allowed. I don't believe it is any different from any other photographs.

Matters went awry shortly after the exhibit containing the photographs of C.T.'s exposed skull was displayed to the triers of fact. While a number of photographs of the victim's remains had been displayed and provided to the members prior to this point in the trial, this was the first exhibit displayed that would likely be viewed as gruesome or grotesque by a sizable percentage of lay persons of normal sensitivity. In our view, the graphic nature of the autopsy procedures shown in the two photographs visually overwhelms the depiction of internal trauma to the victim's skull. One of the nine court members fainted during the witness' testimony on the signif-

icance of this exhibit. An immediate recess was called. During an Article 39(a) proceeding, evidence was received that the member suffered from a condition which made him susceptible to fainting at the sight of blood or injury. The physician treating the member recommended his excusal from further participation in the trial. All parties agreed, and the member was excused. When the trial resumed the eight remaining members were advised of the excusal, but not of the reason therefor.

In evaluating the members' likely reactions to the exhibit in the context of the issue before us, it might be well to examine certain aspects of the testimony of the expert witness shortly before the excused member fainted. The witness described the surgical procedure involved in reflecting the scalp as being "just as the Indians did, it [the scalp] then could be moved forward or back. In this case, it was moved forward so that the scalp is covering the face." After alluding to an inspection of the brain cavity, which procedure had not been performed at the time the photographs in question were taken, the witness explained: "What we have at autopsy is this head, okay. We still have the same head, and indeed, after the autopsy and this skull cap is put back, you have a very beautiful head."[3] Just before the member fainted the witness was explaining the reaction of a human head to blows striking at it from several directions. He compared the head in such circumstance to a "tetherball."

Based on our review of the entire record pertinent to this issue, we find that the military judge abused his discretion in admitting the photographs of the victim's exposed skull. We do not draw a presumption of error from the fact that a member with a peculiar medical condition fainted while the exhibit was being displayed and described. However, this incident is a factor which we must evaluate in assessing possible prejudice to the appellant. The military judge erred in admitting the photo-

graphs because their probative value was clearly outweighed by the potential for prejudicial impact. The military judge's finding that the expert "required" the photographs was not an accurate representation of the expert's testimony. An examination of that testimony reflects that the expert stopped well short of declaring a requirement to use the photographic evidence to communicate adequately with the triers of fact on the matter of blows to the head of the victim. He, thereby, acknowledged that the photographs *per se* had a limited evidentiary value.

The photographs portrayed the results of trauma that could just as easily have been verbally described and readily comprehended. A distinction can be drawn between these photographs and that of the neck cavity of the victim. Our examination of these exhibits convinces us that it would have been more difficult for the members to have visualized a verbal description of the signs of internal hemorrhaging than internal contusions and bruises from blows to the head. Perhaps, the most striking aspect of the challenged exhibit is that color photographs of the exposed skull sit beside drawings which depict the trauma every bit as accurately. The challenged exhibit is internally cumulative. The photographs add very little, if anything, except the potential for shock value. Based on our review of the record we conclude that the Mil.R.Evid. 403 balance in this instance is struck strongly in favor of exclusion.

■ In assessing prejudice, we cannot imagine that the eight members felt good about their former associate's fainting at what was probably already a very uncomfortable moment in the proceeding. The question we must ask is whether it is likely that they, or some of them, reacted out of passion and sought to return findings of guilty to vindicate the rights of the victim that they, and their former fellow member, had viewed. The record in this case does not support such an inference. The evi-

---

**3.** Possibly the witness was involved in a well intended attempt to alleviate suspected uneasiness among the members at this point. However, the tone of his testimony could be per-

ceived as a form of ghoulish titillation marked by gross insensitivity toward the victim. Trial advocates may find a lesson to be learned from this incident.

dence of the appellant's guilt in this case, while it is circumstantial in nature, is overwhelming. We are satisfied that the error in admitting the photographs was harmless insofar as findings are concerned. We reach the same conclusion with respect to sentence. The appellant received the mandatory minimum sentence relating to confinement. We are convinced that the other adjudged punishments of dishonorable discharge, forfeiture of all pay and allowances and reduction to airman basic were not the product of a zealous overreaction to the gruesome nature of the photographic evidence. Accordingly, we conclude that the appellant suffered no prejudice.

### *Duplicity/Multiplicity*

### A

■ The murder specification alleges that the appellant "did, at Bergstrom AFB, Texas, on or about 7 February 1987, with premeditation, and while attempting to perpetrate the offense of rape, murder [C.T.] by means of strangulation." At trial, the defense moved to sever the two parts of what was argued to be a duplicitous specification. R.C.M. 905(b)(5). The military judge denied the motion and ruled that the specification alleged only one offense, murder, although two theories thereof. Article 118(1),(4), UCMJ. *See* R.C.M. 307(c)(3), Discussion (G)(iv).

Appellate government counsel have invited our attention to the excellent brief on the duplicity [4] issue which was submitted by trial counsel. On the strength of the authorities cited therein and other authorities revealed in the course of our research, it appears that pleading two theories of murder in one specification is consistent with a well established precedent in civilian and military case law. We conclude that the military judge's ruling was correct.

Article 118, UCMJ, describes four circumstances in which one who kills another may be found guilty of murder. These four means of murder are joined by the disjunctive word, "or." The basic rule which allows for the pleading of more than one statutory means of committing an offense was explained in a Supreme Court opinion construing a counterfeiting indictment:

> The statute was directed against certain defined modes for accomplishing a general object and declared that the doing of either one of several specified things, each having reference to that object, should be punished.... We perceive no sound reason why the doing of the prohibited thing in each and all of the prohibited modes may not be charged in one count, so that there may be a verdict of guilty upon proof that the accused had done any one of the things constituting a substantive crime under the statute.

*Crain v. United States,* 162 U.S. 625, 636, 16 S.Ct. 952, 955, 40 L.Ed. 1097, 1100 (1896). It must be noted that the primary holding in. *Crain,* which is not pertinent to our consideration and is not discussed herein, was expressly overruled by the Supreme Court in *Garland v. Washington,* 232 U.S. 642, 34 S.Ct. 456, 58 L.Ed. 772 (1914). However, the *Crain* Court's treatment of the duplicity issue, as set forth in the quoted material, has survived as a recognized rule of construction. *Turner v. U.S.,* 396 U.S. 398, 420, 90 S.Ct. 642, 654, 24 L.Ed.2d 610, 625–626 (1970); *United States v. McPherson,* 782 F.2d 66, 68 (6th Cir.1986); *United States v. Olinger,* 759 F.2d 1293, 1301 (7th Cir.1985); *Price v. United States,* 150 F.2d 283, 285 (5th Cir.1945).

This particular duplicity rule was stated in another early case, *Ackley v. U.S.,* 200 F. 217, 221 (8th Cir.1912), as follows:

> Being a statutory crime, the indictment must follow the statute creating the offense. The exception is that, if the statute denounces several things as a crime, the different things thus enumerated in the statute being connected by the disjunctive 'or,' the pleader must connect them by the conjunctive 'and' before evidence can be admitted as to more than

---

4. The Manual uses the term, "dupliciousness." R.C.M. 307(c)(3), Discussion (G)(iv). We have also noted that the adjective, "duplicious," has been used in lieu of "duplicitous" on occasion.

*See e.g., United States v. Hiatt,* 27 M.J. 818 (A.C.M.R.1988) ("duplicitous," in headnote 3 to the opinion is actually "duplicious" in the body, 27 M.J. at 820.)

the one act. To recite that the defendant did the one thing *or* another makes the indictment bad for uncertainty. To charge the one thing *and* another does not render the indictment bad for duplicity, and a conviction follows if the testimony shows the defendant to be guilty of either the one *or* the other thing charged.

(Emphasis in original). *Accord Bianchi v. United States*, 219 F.2d 182 (8th Cir.1955); *Troutman v. United States*, 100 F.2d 628 (10th Cir.1939); *United States v. Isabella*, 210 F.Supp. 281 (D.Mass.1962); *United States v. Mellor*, 71 F.Supp. 53 (D.Neb. 1946).

Of particular interest is a more recent state case, *State v. Keele*, 644 S.W.2d 435 (Tenn.Cr.App.1982), wherein the Court held that the prosecution might proceed on a count in an indictment which, as the specification in this case, alleged both premeditated and felony murder of the same victim. The Court concluded that the indictment alleged "the commission of one offense— murder." 644 S.W.2d at 439. However, the Court added the following: "The allegation of the manner in which the offense was committed is in *alternate* terms." *Ibid.* (Emphasis added). This, of course, is not entirely consistent with the Government's pleading theory in the case before us. We shall now consider how the issue of duplicity has been treated by military appellate courts.

The Army Board of Review, in addressing an alleged instructional error, cited *Crain, supra,* as authority in concluding: "When a single crime may be committed by several modes or with either of several intents, it is proper to charge in the conjunctive in a single count and a finding of guilty upon proof of any one of the modes supports a conviction...." *United States v. Brooke,* 6 C.M.R. 409, 415 (A.B.R.1952), *pet. denied,* 6 C.M.R. 130 (1952). *Cf. United States v. Branford,* 2 C.M.R. 489 (A.B. R.1951), which adopted the *Crain* rule but concluded that drunken driving and reckless driving under Article 111, UCMJ, 10

U.S.C. § 911, were separate offenses and were, thus, duplicitous when combined in one specification.

The Air Force Board of Review followed the same reasoning set forth in *Crain* and *Brooke* in a series of cases: *United States v. Voudren,* 33 C.M.R. 722, 725 (A.F.B.R. 1963), *pet. denied,* 33 C.M.R. 436 (1963) (a specification alleging certain indecent acts against a child is not duplicitous regardless of whether each individual act in a course of conduct might have constituted a separate offense); [5] *United States v. French,* 25 C.M.R. 851, 866, (A.F.B.R.1958), *aff'd/rev'd in part on other grounds,* 10 U.S.C.M.A. 171, 27 C.M.R. 245 (1959) (two specifications each alleging multiple acts constituting the accused's plan to sell classified material to foreign representatives were not duplicitous even though each act might have constituted a separate offense); *United States v. Luckey,* 18 C.M.R. 604, 606 (A.F.B.R.1954), *pet. denied,* 18 C.M.R. 333 (1955) (the allegation of two separate, but more or less simultaneous, threatening acts against a superior does not create a duplicitous specification). See also *United States v. Francis,* 12 C.M.R. 695 (A.F.B.R. 1953), *pet. denied,* 13 C.M.R. 142 (1953), which recognized that a specification alleging criminal acts occurring at divers times is not duplicitous.

The 1969 Manual recited what appears to be a variation of the *Crain* test for duplicitous pleading: "One specification should not allege more that one offense either conjunctively or in the alternative ... However, if two acts or a series of acts constitute one offense or *if an offense is committed by more than one means, they may be alleged conjunctively.*" MCM 1969 (Rev.), paragraph 28b (emphasis added). The underscored language, which is directly applicable to the situation at hand, does not appear in the relevant discussion portion of the current Manual. R.C.M. 307(c)(3), Discussion (G)(iv). However, it is clear enough to us that setting forth two theories of murder conjunctively in a single specification is permitted by nearly a centu-

---

5. The current Manual analysis cites *Voudren* as an authority for the R.C.M. 906(b)(5) discussion of what constitutes a duplicitous pleading. MCM, A21–49 (1984).

ry of case law supporting this form of pleading. We conclude that the military judge did not err by denying the defense motion to sever the murder specification. We must now consider the related issue of multiplicity.

### B

■■■ The appellant maintains that the felony murder language is multiplicious for findings with premeditated murder and attempted rape. Appellant cites as authority the Court of Military Appeals' treatment of similar situations in *United States v. Dodson*, 21 M.J. 237 (C.M.A.1986); *United States v. Teeter*, 16 M.J. 68 (C.M.A.1983), and, more recently, *United States v. Hubbard*, 28 M.J. 27 (C.M.A.1989). In *Dodson* and *Teeter*, the accused had been found guilty, in separate specifications, of premeditated murder and felony murder of the same victim as well as the underlying felony. In each instance the Court dismissed the felony murder specification as fairly embraced within and, thus, multiplicious for findings with the other two specifications. *Hubbard* involved a slight variation wherein the accused, although similarly charged, was found guilty of the lesser included offense of unpremeditated murder, felony murder and the related felony. In this instance the Court dismissed the charge and specification alleging unpremeditated murder, inasmuch as a mandatory life sentence was prescribed only for the felony murder. 28 M.J. at 34.

We find the multiplicity issue difficult since the guidance provided by the Court of Military Appeals is not entirely clear to us. In *Teeter*, the Court noted that the homicide elements of felony murder are included within premeditated murder and that the felony elements are included within the separately charged felony. Therefore, felony murder was determined to be multiplicious for findings with the other two offenses. 16 M.J. at 72. In *Dodson*, the Court relied upon its analysis in *Teeter* in dismissing a felony murder specification. The more recent *Hubbard* opinion muddies the water, in our view. There, the Court chose not to apply the *Teeter/Dodson* formulation directly because the accused had

been found guilty not of premeditated murder, but of the lesser included offense of unpremeditated murder. Article 118(2), UCMJ. In dismissing the unpremeditated murder specification, the Court cited *Teeter* as standing for the proposition "that, if the same homicide is the subject of findings of premeditated murder and felony murder, one should be set aside." 28 M.J. at 34.

We are confronted with a dilemma. If we were to apply the elements comparison test used in *Teeter* and *Dodson*, we would modify the murder specification by deleting the felony murder language therefrom. However, the message of *Hubbard* appears to be that an accused will stand convicted of the same murder only once at the conclusion of appellate review. It can be argued that the combining of two theories of murder in one specification achieves the result of only one murder conviction. Therefore, if the *Hubbard* rationale is followed, no alteration of the existing specification is indicated.

While we are unable to reconcile *Hubbard* completely with the two earlier decisions, we believe the better course is to apply the *Teeter* rule as it was stated by the Court when it was formulated. We can discern no valid basis for holding that the Government might avoid the multiplicity consequences of *Teeter* and *Dodson* by combining two theories of murder in one specification as opposed to pleading them separately. In his instructions on findings the military judge quite properly treated the two murder theories as if they were separate offenses. He advised the members that, if they were to find only one of the two, they might do so by an appropriate exception. Therefore, the appellant, as was the accused in *Hubbard*, "is the subject of findings of premeditated murder and felony murder," even though the findings are combined in but one specification. We conclude that the offense of felony murder in the case before us is embraced within the combined elements of premeditated murder and attempted rape.

We are reluctant to dismiss the felony murder language when, as here, the evi-

dence relating to that offense has been reviewed by us and found to be factually and legally sufficient to support a finding of guilty. However, our findings multiplicity determination is based on a construction of law. If we are mistaken in this construction, our action is subject to correction. Article 67(d), UCMJ, 10 U.S.C. § 867(d); *United States v. Johnson*, 23 M.J. 209 (C.M.A.1987). *See United States v. Coleman*, 26 M.J. 407, 409 (C.M.A.1988).

▮ Accordingly, we modify the Specification of Charge II by deleting the words, "and while attempting to perpetrate the offense of rape." The modified finding of premeditated murder carries a mandatory minimum punishment of confinement for life. MCM, Part IV, paragraph 43e(1) (1984). The military judge instructed the members that the offenses of attempted rape and felony murder were multiplicious for sentencing purposes. He further instructed the members that they must consider only one offense for sentencing purposes, i.e., murder, without particularization. We appreciate that the military judge was faced with a situation which presented a considerable challenge in terms of formulating properly tailored instructions. Having reassessed those portions of the sentence other than confinement, we are convinced that the related punishment elements of dishonorable discharge, forfeiture of all pay and allowances and reduction to airman basic would have been adjudged even if the military judge had dismissed the felony murder language after findings at trial. We conclude that no adjustment of the appellant's sentence is required in light of our action on appeal.

▮ We should consider the approved sentence, which is identical to that adjudged except for forfeitures, from another aspect. Inasmuch as the appellant's sentence included a mandatory punishment of confinement for life, it is appropriate that we consider whether this sentence is unduly severe. *See United States v. Nelson*, 28 M.J. 553 (A.C.M.R.1989). Based on our review of the record and in consideration of the totality of the circumstances developed therein, we have concluded that the approved sentence is warranted in this case and that it is not unduly severe.

We have examined the record of trial, the assignment of errors, the Government's reply thereto and the oral arguments of counsel. We have concluded that the findings, as modified, and sentence are correct in law and fact and that no error prejudicial to the substantial rights of the accused was committed. *United States v. Garner*, 28 M.J. 634 (A.F.C.M.R.1989). *See United States v. Callara*, 21 M.J. 259, 264 (C.M.A. 1986). Accordingly, the findings of guilty, as modified, and sentence are

AFFIRMED.

Senior Judge KASTL concurs.

Judge BLOMMERS (concurring/dissenting in part):

From my review of the record, I cannot conclude that the military judge's ruling admitting the photographic evidence in question (exhibit depicting the victim's exposed skull) constitutes abuse of discretion. *United States v. Abel*, 469 U.S. 45, 54–55, 105 S.Ct. 465, 470, 83 L.Ed.2d 450 (1984); *United States v. Mukes*, 18 M.J. 358 (C.M.A.1984); *United States v. Knudson*, 4 U.S.C.M.A. 587, 16 C.M.R. 161, 180 (1954) (Judge Latimer, dissenting). As the majority opinion notes, the military judge in his ruling on this and three other photographic exhibits indicated they would be relevant in establishing one of the sentencing aggravation factors the Government would be required to prove before a capital sentence could be imposed. *See* R.C.M. 1004(c)(7)(I). It appears to me that this was the basis relied upon for admission of the exposed skull exhibit. However, as was the case with the exhibit depicting the victim's neck cavity, the exposed skull exhibit was likewise relevant as to the issues of intent and premeditation. *See United States v. Benford*, 27 M.J. 518 (N.M.C.M.R.1988). I question whether evidence relevant only to a sentence aggravation factor would be admissible before findings. *See* R.C.M. 1004(b)(2).

In my view, the principle underlying the *Teeter–Dodson–Hubbard* trilogy is that an

accused cannot be convicted twice for the murder of a single person. To do otherwise, the Court in *Teeter* stated, "would leave appellant in the somewhat anomalous position of being convicted of two separate murder charges for one slaying." *United States v. Teeter*, 16 M.J. 68, 72 (C.M.A. 1983). Or, as Chief Judge Everett expressed it in *Hubbard:*

> We have held previously that, if the same homicide is the subject of findings of premeditated murder and felony murder, one should be set aside. *United States v. Teeter*, 16 M.J. 68 (CMA 1983). Clearly, that principle applies where, as here, there are *convictions* of unpremeditated murder and felony murder.

*United States v. Hubbard*, 28 M.J. 27, 34 (C.M.A.1989) (emphasis added). There is only one murder conviction in this case. We found nothing wrong with the manner in which the Government elected to frame the murder charge. When the ink dries on the final court-martial order, the record should fairly characterize the full extent of the appellant's criminal acts. I would not disturb the approved findings of guilty.